**UNITED STATES of America, Plaintiff,**

v.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Defendant.**

**No. 74 Civ. 3121.**

United States District Court, S. D. New York.

July 19, 1977.

Affirmed, 2 Cir., 580 F.2d 1122.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y. by Charles Franklin Richter, Gary G. Cooper, Asst. U. S. Attys., New York City, for plaintiff.

Werner L. Polak, Thomas M. Geisler, Jr., Shearman & Sterling, New York City, for defendant.

## OPINION AND ORDER

PIERCE, District Judge.

This is an action commenced by the United States as plaintiff pursuant to 28 U.S.C. § 1345. Plaintiff alleges that the defendant, Consolidated Edison Company of New York, Inc. ("Con Edison") entered into an oral agreement with the plaintiff to reimburse the Atomic Energy Commission ("AEC") for costs incurred in the summer of 1970 by reason of a release of 200 megawatts of electrical power. The power was released to Con Edison by the AEC in the midst of a New York City area power crisis resulting from the July 21, 1970 failure of Con Edison's Ravenswood electrical generating facility, commonly known as "Big Allis". Plaintiff's complaint asserts four causes of action. Count One sought to recover on an oral contract; that claim was dismissed at the close of plaintiff's case on the ground that the agreement was barred by the Statute of Frauds. Count Two was abandoned by the plaintiff and dismissed by summary judgment prior to trial. Count Three alleges contract by estoppel, and Count Four seeks recovery in quasi-contract. Count Four also asserted an alternative claim, contract implied in fact; this was dismissed by summary judgment on August 2, 1976.

The matter was tried before the Court without a jury for ten days in April and May, 1977. Having heard all the evidence, and having fully considered the matter, the Court concludes that judgment should be entered for the plaintiff on each of its claims asserted in Counts Three and Four. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

### Findings of Fact

In the spring of 1970, certain officers of the federal government became concerned that unless adequate contingency plans were developed, the private power industry might be unable to provide sufficient electrical power to meet the nation's energy needs in the upcoming summer. Upon the conclusion that this was a problem deserving of national attention, the Executive Office of the President established an interagency task force, under the auspices of the Office of Emergency Preparedness ("OEP"), to consider means by which the various federal agencies could assist in identifying potential power crises and taking action to prevent power failures or "brownouts". It became apparent as early as April 1970 that a key component of the plan would be a procedure whereby the AEC would reduce its massive power consumption at its gaseous diffusion uranium enrichment plants. The AEC participated in the development of this procedure, and on

May 5, 1970, the OEP released to the public the government's emergency power assistance program, referred to hereinafter as the "May 5 Plan". The Plan contained the following provision concerning the AEC:

"The AEC will make arrangements to curtail production this summer at the AEC gaseous diffusion plants, which use large amounts of electricity. This could release coal supplies and generating capacity which could be used to assist in meeting fuel shortages and peak loads of the consuming public in parts of the inter-connected system. The diffusion plants are being used, in part, to produce enriched uranium for future use in nuclear power plants." (PX–2).

The May 5 Plan made no reference to the possibility that in the event the AEC were to reduce its power consumption for the benefit of private industry, it might seek to impose upon the release of that power a surcharge to cover its increased costs. However, it is apparent from the evidence that the document constituting the May 5 Plan did not at all attempt to set forth all of the terms and conditions under which power would be released; the Plan as revealed in PX–2 was in the nature of a press release. It was not, as defendant seems to suggest, a commitment binding the United States to undertake emergency assistance without the ability to seek reimbursement for its costs.

The nature of the costs incurred by the AEC as a result of the emergency assistance rendered to Con Edison is best understood through a discussion of the function of the gaseous diffusion plants. The AEC plants were located at Oak Ridge, Tennessee, Paducah, Kentucky, and Portsmouth, Ohio. Originally constructed for the production of special nuclear materials to be employed in national defense, these plants in 1970 were being used primarily to enrich uranium for use in commercial nuclear power plants. The plants convert natural uranium into a gaseous state; the gas is then

passed through hundreds of processing stages or "cascades" to increase the concentration of the isotope U–235. Since each stage works only a slight increase in the concentration of U–235, large amounts of electrical power are required to achieve any amount of enrichment. In the early summer of 1970, the three AEC plants were consuming 2,000 megawatts ("MW") of power supplied under requirements contracts in effect with three utilities, the Tennessee Valley Authority ("TVA"), the Ohio Valley Electric Corporation ("OVEC") and Electric Energy, Inc. ("EEI"). The magnitude of the AEC's power requirements is illustrated by a comparison to Con Edison's peak load requirements in the same period; AEC consumed 2,000 MW to operate three plants and Con Edison transmitted 7,000 MW to supply the metropolitan New York City area and portions of Westchester County.

Shortly after the implementation of the May 5 Plan, the AEC received a request from EEI for permission to cut back on the full 235 MW it was supplying to one of the three uranium enrichment plants. Shortly thereafter TVA and OVEC made similar requests for reductions. George Quinn, then an AEC Assistant General Manager, testified that the AEC was reluctant to grant a substantial reduction, so Quinn sent an inquiry to the Federal Power Commission to determine whether there was in fact the likelihood of a power shortage in the area serviced by these three utilities. Upon confirmation that power reductions would be appropriate, AEC in late June 1970 entered into contract modifications with TVA, OVEC and EEI whereby AEC agreed to reduce its power consumption by 450 MW for the duration of the summer (PX–6 through PX–9). These contract modifications concerning the 450 MW reduction contained no mention of any surcharge to be imposed as a result of the release of the power.[1]

---

1. Prior to the development of the May 5 Plan, the AEC in January of 1970 imposed upon TVA a 10.4% premium on a release of power; however, the evidence concerning this premium is scant and there is no reason to conclude that the January reduction was comparable to the reduction at issue here.

The evidence indicates that it was not until after this first power reduction that officers of the AEC fully realized the increased costs which AEC would incur through the loss of power.[2] The product of the diffusion plants is measured in separate work units ("SWUs"); the SWUs·are calculated by measurements of the assay levels of enriched uranium at various stages in the cascade process. The diffusion plants incur substantial fixed costs regardless of the number of SWUs produced; thus the AEC experienced substantial efficiency losses by operating its plants at levels below the 2,000 MW capacity. Both plaintiff's and defendant's expert witnesses agreed that such efficiency losses result from substantial power reductions. Upon becoming aware of the extent of its increased costs, the AEC in early July 1970 began considering whether it should impose a surcharge upon any further power reductions.

By July of 1970, Con Edison was already experiencing problems with its power needs. On May 20, 1970, Con Edison's nuclear plant at Indian Point went out of service, resulting in a loss of 260 MW of generating capacity. On July 21, 1970, Con Edison suffered a major power crisis with the outage of Big Allis, its 1,000 MW plant at Ravenswood.

Charles Luce, Con Edison's Chairman and Chief Executive Officer, testified that the failure of Big Allis constituted the most severe emergency faced by Con Edison during his ten years with the utility. Luce immediately met with his production and purchasing personnel to begin a search for additional electrical power. At the time, Con Edison was a party to a "pool" agreement with several other New York State utilities whereby any member of the pool could purchase from other members three different types of power (DX–B–8).

The first type, known as "economy power" involved purchases on an hour-to-hour basis from the most efficient generating plant available within the system. This power was priced according to the costs incurred in generation. Next, "supplemental power" was available to pool members at a fixed rate when the purchasing utility did not have sufficient capacity to meet its load. Finally, "emergency" power could be purchased during true crisis situations; such power usually carried a ten percent surcharge and was available only for short periods of time. Despite the existence of these emergency pooling arrangements, and notwithstanding the existence of similar agreements between the New York State power pool and other such pools in neighboring states, the Big Allis power shortage was so severe that Con Edison immediately looked elsewhere for a long-term purchase of back-up power.

The magnitude of Con Edison's July 21st power crisis had not gone unnoticed by the Executive Office of the President. On July 22, 1970, a representative of the OEP telephoned the offices of Con Edison to state that the government could perhaps come to Con Edison's assistance pursuant to the provisions of the May 5 Plan. On July 23, 1970, Charles Luce called David Freeman of the OEP, who explained that the AEC gaseous diffusion plants had already made one power reduction, but that there might still be room for a further power release to Con Edison. Luce stated that Con Edison wanted the power, subject only to confirmation that it could be transmitted to the New York area. Freeman then informed Luce that he should call George Quinn at the AEC to work out the details. There was no mention in this first conversation of any surcharge; however, it is clear that these talks with the OEP were only preliminary discussions.

On July 23, 1970, a series of significant conversations were had between the parties and with others. George Quinn at AEC was informed by the OEP of the New York power crisis and of the fact that Con Edison would be calling Quinn regarding the possibility of a further power reduction in order

---

**2.** George Quinn conceded on cross-examination that the AEC was aware during the 1960's that power reductions resulted in efficiency losses; however, there is no persuasive evidence that AEC knew prior to June of 1970 the extent of such losses.

to assist Con Edison. Quinn reported the situation to E. H. Bloch, AEC Acting General Manager, and informed him that it was the opinion of the AEC staff that a surcharge should be imposed upon any release of power to Con Edison. Quinn did not discuss with Bloch the amount of the surcharge or how it could be imposed.

The same day Charles Luce of Con Edison telephoned Fred Chambers, an officer of TVA, to inquire about the availability of power from TVA and to ask Chambers what he knew about the possibility of an AEC power reduction. Luce also was interested in whether TVA could assist in the transmission of power to New York. Chambers stated that TVA had no surplus power in its system, and in response to a specific inquiry by Luce, informed Luce that TVA could start up an old inefficient steam generating plant at Watts Bar, but that it would take as long as three weeks to wind the plant up to its full 200 MW capacity. Chambers also told Luce that starting up Watts Bar would be quite expensive.

The evidence indicates that at the time of this discussion Luce was more concerned with getting power quickly than he was with the cost to Con Edison. Luce asked TVA's Chambers about the availability of power from the AEC, but Chambers stated that he could not speak for the government. The conversation ended on this note and Chambers thereafter telephoned S. R. Sapire, operations manager at the AEC Oak Ridge plant.

Chambers asked Sapire about the possibility of a further AEC reduction; Sapire at first stated that the AEC could not possibly make a further reduction. However, shortly thereafter Sapire called Chambers to inform him that the AEC could make a further reduction but that it would be rather expensive. According to Chambers, Sapire estimated the additional cost at between 3 and 7 mills per kilowatt hour (Tr.

at 324). Chambers then called Luce to pass this information on to Con Edison.

In the course of this second conversation between Chambers and Luce on July 23, 1970, Chambers stated that AEC had already made one reduction and that a further reduction would be "pretty expensive" because AEC was incurring substantial efficiency costs. Luce stated that it was no time to be discussing costs. Chambers then informed Luce that AEC power could cost Con Edison as much as twelve to fourteen mills per kilowatt hour; however, Chambers cautioned that the price could not be determined until the completion of calculations by the AEC.[3] Later that same day Chambers spoke with Arthur Hauspurg of Con Edison to confirm that TVA could assist in the transmission of AEC power to New York.

The next contact between the parties occurred between Louis Roddis, Con Edison's President, and George Quinn at the AEC. Roddis had previously been informed by David Freeman of OEP that Con Edison might be able to obtain between 250 and 300 MW from the AEC. Following preliminary confirmation that this power could be transmitted to New York, Roddis called Quinn to inform him that Con Edison was interested in the availability of the power. Quinn stated that AEC had to work out appropriate arrangements with its supplier utilities and that he would call Roddis back. Again, there was no mention of a surcharge; however, the Court finds that this conversation was yet another preliminary discussion. As the record indicates, Con Edison was primarily concerned with the availability of the power and with insuring that it could be transmitted to the New York area.

■ On July 23, 1970, representatives of the Executive Office of the President called Quinn to inform him that the White House

---

3. Luce's recollection of the conversations differs. According to Luce, Chambers' comment concerning high costs to AEC was made in response to an inquiry Luce made in the first conversation as to whether AEC might agree to shut down its plants altogether for Con Edison's benefit. Since the record is otherwise devoid of any suggestion that anyone contemplated a complete shutdown of the enrichment plants, the Court concludes that Chambers, a relatively disinterested witness, had a more accurate recollection of the conversations.

intended to issue a press release that afternoon concerning the release of the power. Quinn testified at trial that he informed both David Freeman of the OEP and one Mr. Kriegsman, a staff assistant to the President, that the AEC intended to impose a surcharge upon the release of power to Con Edison. Mr. Kriegsman informed Quinn that the President had directed that the power be made available to Con Edison. There is no indication that anyone at the White House objected to the imposition of a surcharge.[4] The White House press release, issued shortly thereafter, read as follows:

> "The President announced today that the Atomic Energy Commission will make available several hundred megawatts of power to the Consolidated Edison Company serving New York City.

> "This action is being taken to help relieve the critical power shortage in New York City created by the failure of its largest generating unit on July 21.

> "The release of this power is pursuant to the contingency plans previously developed and announced by the Office of Emergency Preparedness on May 5.

> "The power would be made available by reducing the use of electricity at the AEC's gaseous diffusion plants. The Consolidated Edison Company is proceeding with the necessary arrangements with the other utility companies involved and the AEC.

> "It is expected that the power will be transmitted to New York over the interconnected grid system of the utilities in the eastern United States." (DX–R–3 at 2.)

Defendant notes that this press release made no mention of a surcharge; however, the Court finds that this document was no more than it purported to be—a press release. The document contained no information about price; indeed, it did not even set forth the quantity of the power to be released. It did not constitute an agreement between the plaintiff and Con Edison.

Nevertheless, the White House announcement did constitute the first statement by either party that the release to Con Edison would in fact take place. Louis Roddis, Con Edison's President, first saw the press release while he was being interviewed on an evening news program concerning the power crisis. George Quinn communicated the substance of the press release to S. R. Sapire, operations manager of the Oak Ridge plant, and informed Sapire that the decision to release the power had been taken from AEC's hands by the White House announcement. Nevertheless, as the Court has found, the AEC had made it clear to both the White House and to the OEP that it intended to impose a surcharge on Con Edison; the following day Quinn also informed a staff member of the Joint Congressional Committee on Atomic Energy that AEC would seek a surcharge.

On the morning of July 24, 1970, Quinn again spoke to Sapire to confirm that the power could be transmitted to New York; the AEC officers also spoke concerning whether there might be surplus power available in the American Electric Power system. The details of this discussion were passed along to AEC Acting General Manager Bloch.

Quinn then placed a call to Louis Roddis, and spoke to Charles Luce in Roddis' absence. Quinn stated that he wanted to discuss the terms and conditions of the release and that the AEC was now in the position to offer 200 MW to Con Edison. Quinn informed Luce that AEC had made a previous reduction of some 450 MW, and that while AEC would prefer not to make a further reduction, they were willing to do so. It is undisputed that Quinn informed Luce that in the event the release was effected, the AEC would look to Con Edison for reimbursement of its additional costs. Luce stated that Con Edison was still studying their end of the transmission problem

---

**4.** In his November 21, 1974 deposition, Quinn stated that he recalled no discussion with Freeman on July 23, 1970 concerning the surcharge; however, Quinn testified at trial that his recollection had since been refreshed; the Court accordingly finds that the White House was informed of the intent to seek a surcharge prior to the issuance of the press release.

and that he was not yet in a position to request the power. Apparently unconcerned with the possibility of a surcharge, Luce stated that Con Edison would be willing to pay whatever surcharge had been paid by the recipients of the previous 450 MW reduction. Quinn did not inform Luce that the recipients of the 450 MW had not been asked to pay any surcharge.

Quinn stated that the amount of the surcharge was under study and that he could not fix a price at that time. However, Quinn did give Luce examples of the type of costs the AEC would incur, such as the shut down of certain equipment. Luce testified that Quinn referred to efficiency losses. On cross-examination (Tr. 808) and in response to questions by the Court (Tr. 821), Charles Luce stated that Quinn had explained to him that the 200 MW reduction would result in higher costs to AEC than did the 450 MW reduction, since the incremental losses were greater when the plants were required to reduce consumption to as low as 1,350 MW. The conversation ended with Quinn's advice to Luce that if Con Edison wished to receive the power, it should make arrangements with AEC's supplier utilities, TVA and OVEC.

On the same day, July 24, 1970, AEC Acting General Manager Bloch sent a memorandum to AEC Chairman Seaborg and the Commissioners of the AEC. The memo reads in part as follows:

"The Oak Ridge Operations Office has been authorized to proceed to make available up to 200 MW as it may be needed by Consolidated Edison and as arrangements can be made with our power suppliers and the interconnected utilities for transmission of this power to the New York area. In agreements effecting such reductions, provisions will be included to recover from the utilities involved AEC costs and losses which result from the reductions." (DX–T–3)

As the language of this memorandum indicates, the AEC intended to recover the surcharge through the billing chain between itself and Con Edison. As Quinn had informed Luce, because of the nature of AEC's contracts with its suppliers, Con Edison would have to purchase the power from TVA and OVEC. The AEC sought to include the surcharge in its contract modifications with the suppliers, and those suppliers in turn passed the added charge along the transmission chain to Con Edison. Defendant would have the Court draw the inference that AEC's failure to inform Con Edison directly of the amount of the surcharge, and its attempt to collect the same through the billing chain, indicate some underhanded dealing, or at the least ungentlemanly behavior. The Court can draw no such inference. The Court finds that the AEC, and in particular George Quinn, did not directly inform Con Edison of the surcharge amount because he saw no need to do so. He had informed Luce that Con Edison would be expected to pay AEC costs and that Con Edison should obtain the power through the supplier utilities. He had informed Luce that AEC was still in the process of calculating the surcharge. The surcharge was to be collected through the billing chain.

The evidence also indicates that Con Edison did not again contact AEC to determine the amount of the surcharge. Rather, Con Edison and the AEC began on July 24, 1970 to deal with each other through the supplier utilities, particularly TVA. Late in the day on July 24, 1970, AEC began making preparations to reduce its power consumption by July 27, 1970, the following Monday.

At midnight on July 27, 1970, the AEC plants began the gradual reduction of their power consumption. By seven o'clock in the morning on the same day, the diffusion plants had reduced consumption by the full 200 MW. The power was transferred from system to system across the eastern United States and into New York State. Now assured of adequate reserves to meet the energy needs of the metropolitan New York area, Con Edison had weathered the crisis.

The testimony of Bertram Schwartz, then a Con Edison assistant vice-president and now senior vice-president, illustrates how vital this additional 200 MW was to Con Edison's operations. While seeking to mini-

mize the extent of the benefit to Con Edison, Schwartz conceded on cross-examination the following facts concerning Con Edison's capacity and load requirements in the summer of 1970.

The 200 MW supplied by AEC constituted three percent of Con Edison's peak load requirements. Despite the availability of this additional power, on fourteen separate days during the summer of 1970, Con Edison reduced voltage by between three and five percent. Schwartz testified that when a voltage reduction goes as far as eight percent, Con Edison's contingency plan is to begin disconnecting customers. This procedure is referred to as "load shedding". The utility must shed load rather than reduce voltage beyond eight percent since such a reduction poses a risk of damage to electrical equipment. As Table V to defendant's additional answers to plaintiff's 24th interrogatory illustrates, on six separate days between July 27, 1970 and September 28, 1970, Con Edison's reserve capacity was well under 200 MW (PX–48B). Thus, if not for the 200 MW purchased from AEC, there would probably have been several days in the summer of 1970 when Con Edison would have been without any reserve capacity. As Table VI to the same answer indicates (PX–48B), Con Edison made voltage reductions of five percent on eighteen different occasions during the period. Had Con Edison been without the AEC's 200 MW, it is likely that at least some of those eighteen reductions would have approached or exceeded eight percent, with concomitant load shedding. Indeed, even with the 200 MW Con Edison was compelled to engage in eight percent voltage reductions on

three different days, and on September 22, 1970, Con Edison did in fact shed load. As Mr. Schwartz stated, Con Edison certainly needed the 200 MW; even with that additional power, the utility was not able to supply uninterrupted service. Charles Luce's testimony was to the same effect.[5] Although Con Edison maintains that it is not legally obligated to supply electricity to the public, Schwartz did concede that Con Edison has a duty to supply electricity. Luce testified that "we are held responsible for supplying energy to New York City." (Tr. 798)

The price paid by Con Edison to the supplier utilities for the AEC power was comparable to Con Edison's own cost of generating power. Con Edison paid TVA and OVEC 7.85 mills per kilowatt hour, including transmission charges. The cost of the power itself was 5.20 mills or $1,648,275.51. The cost of transmission was $837,046.26 (PX–48A at 15). The cost to Con Edison during the summer of 1970 to produce its own electrical power ranged from 7.70 to 8.96 mills per kilowatt hour (see PX–48B at 20). Con Edison paid a total of $2,485,-321.77, or 7.85 mills, for the AEC power received between July and October 1970. As noted, this cost was comparable to that which Con Edison would have incurred had it generated the power itself. However since Con Edison was compelled to use the 200 MW on a twenty-four hour basis, the 200 MW cost Con Edison more than certain other power which it could have made use of during off-peak hours.[6] The evidence concerning whether Con Edison made a "profit" or a "loss" on the resale of the 200 MW is equivocal, to say the least.[7]

---

**5.** Luce also testified that the availability of the 200 MW had a beneficial effect upon the company's goodwill and at least an indirect beneficial effect for Con Edison shareholders.

**6.** As noted previously, Con Edison could often purchase "economy power" from the New York State power pool. Con Edison's Arthur Hauspurg testified that while Con Edison needed "firm", i. e., readily available, power from the AEC, it would have preferred to use the power only when it needed it. However, the gaseous diffusion plants could not repeatedly increase and then decrease power consumption

to suit Con Edison's needs; thus, Con Edison was required to use the 200 MW during periods when it could have turned to cheaper power.

**7.** Hauspurg testified that since the customer pays only an "average" cost for Con Edison power, Con Edison had a "gain" to the extent that the 200 MW cost less than Con Edison's average power costs on any given day and a "loss" to the extent that the 200 MW cost more than the average cost for power (Tr. 898). Bertram Schwartz stated that Con Edison was paid by customers $631,000 less for the 200 MW than Con Edison paid for the power; how-

Contrary to the state of the record on the question of Con Edison's "profit" or "loss" resulting from the receipt of the AEC 200 MW, it is clear to this Court that the plaintiff did incur a loss as the result of the release of the 200 MW. The detriment to the plaintiff is best understood through an examination of its increased unit costs of production. At the time of trial, plaintiff presented evidence concerning what those costs actually amounted to (see PX–41). However, in July of 1970, the AEC was able only to develop an estimate of its costs.

On July 28 and 29, 1970, officials at the AEC had calculated a surcharge based upon an estimate of AEC additional costs incurred by reason of the 200 MW reduction. As George Quinn testified, the concept behind the surcharge was to develop a charge per kilowatt hour which would insure that the unit cost of producing one SWU after the reduction would be the same as the unit cost without the reduction (Tr. 28). Put another way, the surcharge was designed simply to compensate the AEC for its increased unit costs incurred by reason of the substantial efficiency losses flowing from operating the diffusion plants without the 200 MW.

The AEC's preliminary calculations came to a surcharge of 5.41 mills per kilowatt hour. This amounted to approximately 104% of the cost of the raw power, and 67% of the total 7.85 mills price paid by Con Edison. The figure was calculated upon an estimation of the increased production costs incurred by reducing the power consumption at the diffusion plants from 1,550 MW (the level of operation following the prior 450 MW reduction) to 1,350 MW (see PX–13).[8]

George Quinn discussed this surcharge with the AEC Acting General Manager on July 29, 1970. Quinn stated that there was no discussion concerning whether AEC should seek to impose an averaged surcharge, i. e., one which would take into account the fact that the AEC plants had already reduced their consumption by 450 MW and which would have averaged AEC's total increased costs between Con Edison and the recipients of the previous power reduction. Quinn testified that S. R. Sapire, the Oak Ridge operations officer, had suggested a 3.00 mill surcharge prior to July 29, 1970; however, Quinn never saw any data basis for that suggestion. Quinn also testified that there was no consideration given to whether the amount of the surcharge should be cleared with the White House. On the same day Quinn sent a telex to the Oak Ridge office authorizing Sapire to initiate contract modifications with AEC's suppliers (PX–14). On August 3, 1970, AEC entered into contract modifications with TVA and OVEC whereby the AEC released its right to the 200 MW for the duration of the summer. The agreements (PX–15 through PX–17) also provided that the utilities would arrange through the billing chain to collect the 5.41 mills surcharge from Con Edison. The payment of this amount was to be credited against TVA and OVEC's monthly bills to AEC. Con Edison was not informed of the terms of these contract modifications.

According to the testimony of Louis Roddis, Con Edison first learned of the 5.41 surcharge on August 6, 1970, when it was informed that Philadelphia Electric Power had billed the first New York state utility in the chain, Niagara Mohawk, a five mill surcharge. Upon being informed of the size of the charge, Charles Luce objected and directed Roddis to determine what amount of surcharge had been paid by the

ever, Schwartz stated that this "loss" was offset by $595,000 in increased revenues from the ability to sell the additional power in the first place (Tr. 933–35). The matter is best summed up by defendant's answer to plaintiff's 15th interrogatory: "whether the 200 MW . . . was sold to Con Edison's customers at a 'profit' or a 'loss' and the magnitude of such 'profit' or 'loss' cannot be determined." (PX–48B at 18). The Court is not persuaded by Schwartz' attempt to distinguish between "engineering" and "accounting" costs.

8. This data base was later recalculated. See note 11 *infra*.

recipients of the prior 450 MW reduction.[9] Roddis quickly learned that the recipients of the prior reduction had not paid any surcharge to the AEC. He then telephoned Quinn to ask whether this 5.41 mills surcharge had the backing of the AEC Commissioners. Roddis also suggested that such a surcharge might cause political embarrassment to the AEC and to the White House. However, Roddis, did not state that Con Edison was going to refuse to take any more AEC power. On August 10, 1970, Con Edison sent to TVA and to the American Electric Power Company two identical telegrams which read as follows:

> "Loss of production surcharges proposed by Atomic Energy Commission in connection with power you are furnishing to us are to be subject of discussions between us and AEC. We request that you do not accept any such inefficiency surcharge without our consent and that you refer them to us for advice." (DX–H–4)

Following this telegram, a series of telephone calls, letters, and meetings ensued between the parties. Con Edison sought to make a political issue of the surcharge by bringing it to the attention of the White House. However, the AEC apparently perceived no political implications with respect to the surcharge, and continued to insist upon its payment. On August 10, 1970, Bertram Schwartz of Con Edison met with George Quinn to discuss the calculations which formed the data base for the 5.41 mill surcharge. Schwartz suggested different means of calculating the surcharge,[10] and stated Con Edison's concern that the charge, in its present form, would not allow the utility to pass the added costs along to its customers. When Schwartz asked why AEC had imposed no surcharge upon the recipients of the 450 MW reduction, Quinn answered that the AEC had "goofed" and that they were seeking to renegotiate the agreements with the recipients of the prior reduction to include a surcharge. By telex dated August 11, 1970, the AEC instructed its Oak Ridge office to begin renegotiations for such a surcharge. However, the telex recognized "that it may be impractical for the premium to be made retroactive" (PX–19). The attempts to impose a surcharge upon the recipients of the prior reduction proved fruitless.

Throughout this period Con Edison asserted that it would pay only what the recipients of the 450 MW had paid. At a meeting between Quinn and Luce on September 1, 1970, Luce stressed that this was what he had stated in the July 24, 1970 telephone conversation. However, Luce confirmed that Con Edison had requested the power from the AEC and he did not state that Con Edison intended to discontinue its receipt of the power, even when Quinn informed him that Con Edison was under no obligation to continue receiving the 200 MW. At the September 1, 1970 meeting the AEC agreed to consider the concept of an averaged surcharge;[11] however, Quinn could not recall at trial whether Luce stated that Con Edison would pay such a surcharge or if he stated that Con Edison would pay only if the other utilities also paid. In any event, since the AEC had been unsuccessful in imposing any surcharge upon the 450 MW reduction, Con

9. Three of Con Edison's officers, Luce, Hauspurg, and Schwartz, each testified that on July 24, 1970 an officer of the American Electric Power Company had informed Con Edison that the recipients of the 450 MW reduction had paid to the AEC a 20% surcharge, approximately 1 mill per kilowatt hour. However, the record contains no explanation of the source of this apparently inaccurate information and it is uncontroverted that Con Edison never verified this figure with the AEC.

10. Schwartz indicated to Quinn that PX–13 was based upon the incorrect assumption that the 200 MW reduction would continue through October; in fact, the 200 MW was restored to AEC on October 1, 1970. The calculations in PX–13 were accordingly modified prior to the September 1, 1970 meeting between the parties.

11. Quinn testified that the AEC surcharge had been recalculated prior to the meeting to reflect the return to AEC of 350 of the 450 MW reduction as of August 30, 1970. The surcharge was also recalculated to reflect the actual period of the 200 MW reduction. See note 10, *supra.*

Edison's position did not leave much room for negotiation. Following the September 1, 1970 meeting, the AEC did make certain recalculations and offers to compromise the matter; however, Con Edison adhered to its intransigent position and needless to say the parties failed to come to any agreement.

Con Edison continued to receive the 200 MW until October 1, 1970.[12] Defendant never advised the AEC that it would refuse to pay a surcharge altogether, nor did Con Edison ever state that it would stop accepting the power. It is clear from the record that during this period Con Edison knew that AEC was demanding compensation for its increased costs; indeed, it knew as early as August 6, 1970—only ten days after the power had begun to flow—the magnitude of the surcharge sought by AEC.

At trial, Charles Luce testified that he was primarily disturbed by the fact that the AEC had released power gratuitously to the recipients of the 450 MW and that it thereafter sought to impose a substantial surcharge upon Con Edison. Luce stated that had the others paid, Con Edison would have been willing to pay an equal amount. Indeed, said Luce, he would have agreed to a surcharge of ten mills, twice that sought by the plaintiff, if the recipients of the prior reduction had paid such a charge (Tr. 793).

Nearly five trial days were devoted to the question of what were the AEC's actual losses, if any, which resulted from the 200 MW reduction. It is uncontroverted that by reason of the power reduction, the diffusion plants produced 126,000 fewer separative work units of enriched uranium than would have been produced had the plants not experienced this reduction. (PX–41. See Tr. 1160).

In preparation for the trial of this action, plaintiff developed a calculation of what it maintains were its actual costs resulting from the 200 MW reduction. This calculation, PX–41, is based upon a unit cost ap-

proach. The method of its calculation is the same as the AEC (now the Energy Research and Development Administration, or "ERDA") employs in the calculation of the present surcharge which it routinely imposes whenever there is a power reduction at the diffusion plants for the purpose of meeting the needs of a utility.

ERDA's present surcharge is a flat fee, recalculated on a semi-annual basis, which does not change depending upon the size of the power reduction (Tr. 556–58). ERDA, and its predecessor agency the AEC, have since 1972 employed the same method of calculating its losses in determining the appropriate amount of the surcharge. Since the present surcharge is calculated on a prospective basis, it is based primarily on estimates.

By comparison, the surcharge calculation contained in PX–41 is based primarily on actual data. Earl Sullivan, Chief of the Power Branch at ERDA's Oak Ridge diffusion plant, testified that PX–41 is based 93% on actual data and 7% on estimated or extrapolated data (Tr. 580). In Sullivan's opinion, PX–41 is accurate to within one percent of reality (Tr. 519).

PX–41 is a thirteen-page document; to explain it fully would require as many pages here. Suffice it to say that PX–41's ultimate conclusion here is that by reason of the 200 MW drop, the AEC produced 126,000 fewer SWUs, yet the SWUs which it did produce cost it $1.9163 more per SWU to produce. Multiplying the increased unit cost per SWU by 822,833, the number of SWUs actually produced, PX–41 reveals that the AEC's total increased cost was $1,576,795. This figure translates into a charge of approximately 4.79 mills per kilowatt hour, somewhat lower than the 5.41 figure contained in PX–13.

Tables One and Two to PX–41 reveal that although the AEC power costs in the relevant period were substantially lower than would have been the case if AEC had

---

12. During the restoration of the 200 MW, TVA requested that it be allowed to retain 100 MW instead of fully restoring the power to AEC. The AEC agreed to this procedure in return for

a 14% premium on the cost of the 100 MW. Quinn testified that this 14% premium is not comparable to the 200 MW surcharge, and there is no evidence to the contrary.

received and paid for the 200 MW (see Table I), the plants produced so many fewer SWUs that the cost per SWU produced increased. As plaintiff's witnesses testified, the fixed operating costs of the diffusion plants remained the same regardless of the level of production and power consumption. Similarly, the AEC incurred the same added factor costs despite the decreased production.

Among the fixed operating costs are expenses relating to cascade operations, testing programs, uranium scrap recovery, and power distribution. Since the enriched uranium is transported from one plant to another, there are also transportation costs and security guard expenses. These fixed costs are set forth in Appendix 2 to PX–41.

Among the added factor costs are items such as expenses relating to start-up, shutdown and stand-by of the enrichment process. There were also warehousing costs, costs relating to analysis of the enrichment product, as well as administrative and other costs. See Appendix 3 to PX–41.

As Eugene Schmidt, an ERDA auditor testified, PX–41 reflects economies of scale. By producing more SWUs, the unit cost is decreased. The incremental increased power costs are outweighed by the increased SWU production.

Despite hours devoted to the cross-examination of plaintiff's witnesses on PX–41, the defendant did not seriously challenge any of the factual bases of PX–41. Rather, the defendant advanced a series of alternative methods to calculate the AEC costs, and through its expert witness took issue with certain of the underlying principles contained in PX–41.

Defendant first argues that the AEC has sustained no loss at all. By statute, the uranium enrichment program is required to recover its costs. 42 U.S.C. § 2201(v)(B). Thus, the SWUs sold by the AEC and now ERDA are priced with an eye to complete recovery of the government's expenses. In August of 1973, the AEC adjusted the price of its SWUs upwards to reflect the increased costs incurred by reason of the 200 MW reduction. ERDA has designated the

period between 1971 and 1980 as a "campaign period" in which it will recover the added costs incurred. (Tr. 651–52). Plaintiff's witnesses testified that in the event there is a recovery in this action, the ERDA will pass the benefit along to its customers through adjustments in the price per SWU (Tr. 676–77). Con Edison argues that since the AEC passed along the increased cost, it has no loss. This is a legal argument which the Court will address *infra.*

Con Edison next argues that the plaintiff can suffer no actual loss until the year comes when ERDA cannot meet actual demand for enriched uranium and accordingly experiences the actual loss of the 126,000 SWUs. Con Edison notes that for many years the production of enriched uranium by the government has exceeded demand. Thus, argues Con Edison, since ERDA has extra SWUs in inventory, it can suffer no loss from the lack of 126,000 SWUs. The Court rejects this argument as frivolous. It is apparent that ERDA's inventory is an asset of its operations; further, defendant's own expert witness testified that demand is increasing for enriched uranium. It is farfetched to suggest that the government must wait until it exhausts its supply of enriched uranium before it can prove a loss flowing from the lower SWU production.

Con Edison's expert Dr. Leonard Geller stated that in his opinion any increased cost to the government would be covered by a 15% contingency factor included in ERDA's SWU pricing. However, George Quinn testified that this contingency factor does not cover the extraordinary type of losses which occurred here; the Court finds Quinn's testimony on this point more authoritative and more persuasive.

Defendant's expert did not challenge the factual basis of PX–41, but rather employed the same data in developing assorted alternative means of calculating a loss to the plaintiff. In his first alternative, Doctor Geller posited that "efficiency losses" should include only those costs directly associated with the less efficient use of electrical power by the plants. He excluded from this calculation any fixed operating costs or

added factor costs which would be applied against the cost of SWUs (Tr. 1185–87). Under this concededly narrow definition of "efficiency losses" Geller concluded that the AEC lost $125,000 (DX–U–9).

Doctor Geller's second approach was to calculate a surcharge in a manner similar to that which the ERDA now employs to calculate its flat fee surcharge. Based on data from PX–41, Geller calculated the total increased costs to the AEC as the result of both the 450 MW reduction and the 200 MW reduction. He then calculated an averaged surcharge of $1,300,000, which would have been the charge for the 200 MW reduction (DX–X–9; see Tr. 1112–17).

Doctor Geller described his third alternative calculation as a "threshold method". This method proceeds on the assumption that Con Edison would be required to compensate plaintiff only for those losses flowing from the 200 MW reduction which exceeded comparable losses incurred by the prior 450 MW reduction. Using the costs set forth in PX–41, Doctor Geller took plaintiff's calculation that the 200 MW drop caused it a loss of 4.79 mills per kilowatt hour. He then calculated that the 450 MW drop, under the same approach, cost the AEC 4.71 mills. The difference, 0.8 mills, would be the cost to Con Edison (see DX–Y–9). This amounts to $254,000. As Doctor Geller conceded on cross-examination, this method proceeds from the assumption that the 450 MW reduction was "free".

The final calculation presented by Con Edison, DX–W–9, looked to AEC price planning data compiled in 1971 and modified that pricing plan to include costs incurred by reason of the 200 MW reduction. Spreading the increased cost over the ten-year "campaign period" in which AEC has sought to recover its extra costs, and taking into account inventory levels throughout that ten-year period, Doctor Geller concluded that the increased cost to AEC totalled $793,000 (Tr. 1155). However, on cross-examination, Geller stated that this calculation was based upon estimates developed in 1971; he further stated that he was not surprised to learn that the actual costs in the ten-year period have thus far been greatly in excess of the 1971 estimates.

Accordingly, the plaintiff has presented a calculation which sets forth its loss at $1,576,795. Con Edison has put forth theories setting forth AEC's loss as zero, $125,-000; $254,000; $793,000; and $1,300,000, depending upon which theory one selects. However, the Court finds most significant the fact that defendant has not effectively challenged the data basis of PX–41 and the fact that Doctor Geller conceded that even if the plaintiff was today awarded 1.4 or 1.5 million dollars, that amount of money would be inadequate to produce today the 126,000 SWUs which the AEC lost by reason of the 200 MW reduction (Tr. 1194). This testimony lends more weight to plaintiff's calculation than to any of those presented by the defendant.

### Conclusions of Law

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345. In the claims which remain, plaintiff asserts contract by estoppel and quasi-contract or unjust enrichment. Plaintiff has also asserted a claim for reimbursement of costs under the doctrine of emergency assistance.

While no contract law claims remain in the action at this point, certain of the equitable principles discussed within require that reference be made to the alleged contract. Accordingly, based upon the factual findings set forth above, the Court finds that the July 24, 1970 conversation between Quinn and Luce was sufficiently definite to constitute an agreement. The parties are known—Con Edison and the AEC. The amount of the power was fixed—200 MW. The parties agreed that Con Edison would reimburse the AEC for its costs. It was understood that the costs would be determined by AEC. Indeed, by reason of his prior conversations with Fred Chambers of TVA, Con Edison's Charles Luce had a general awareness of the possible extent of those costs.

The Court rejects defendant's contention that the May 5 Plan constituted an obligation on the part of the plaintiff to render

emergency assistance to Con Edison without the ability to seek reimbursement for its costs. The May 5 Plan was too indefinite to constitute a contract. Further, the Court does not find that David Freeman offered Con Edison power free of charge in his conversation with Luce on July 23, 1970. Nor did the July 23, 1970 press release constitute an agreement between Con Edison and the White House whereby the government agreed to furnish the power free of surcharge. The Court finds that all these contracts between the parties were but preliminary discussions; they clearly were too indefinite to form the basis for an agreement.

However, the July 24, 1970 oral conversation between Luce and Quinn was sufficiently definite to form an agreement. Plaintiff has thus proved that an oral agreement was made; it has proven the terms of that agreement, and it has proven that Con Edison has refused to make payment in accordance with that agreement. Thus, if not for the fact that the oral agreement is rendered unenforceable by reason of the Statute of Frauds, plaintiff would prevail on its contract claim.

### Contract by Estoppel

■ In its third cause of action, plaintiff asserts that the defendant "breached its contract with AEC for the costs incurred by AEC in relinquishing 200 MW of power to TVA and OVEC and by its actions and inactions is estopped from denying the existence of said contract." (Para. 41). In order to prevail on this claim, plaintiff must demonstrate that Con Edison, through its words or conduct, led the plaintiff to change its position in reliance upon the oral agreement. The plaintiff must further prove that its reliance resulted in detriment to it. See *Dickerson v. Colgrove,* 100 U.S. 578, 580–81, 25 L.Ed. 618 (1880); *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.,* 413 F.Supp. 555, 559 (S.D.N.Y. 1976); 3 Williston, Contracts, Section 692 (3d ed. 1972).

■ Con Edison first argues that the plaintiff must prove fraudulent representa-

tions by the defendant in order to overcome the bar of the Statute of Frauds; absent such fraud, argues defendant, it can continue to invoke the Statute as a defense to the contract. See *Centennial Estates, Inc. v. Filor,* 33 A.D.2d 1042, 308 N.Y.S.2d 732 (2d Dept. 1970). The Court rejects the notion that plaintiff must prove actual fraud in order to rely upon the doctrine of estoppel; it is sufficient if the defendant's representations led the plaintiff to rely upon Con Edison's promise that it would pay AEC costs. Here Con Edison promised to reimburse the AEC for its costs; upon learning the extent of those costs, Con Edison altered its position and stated that it would pay only if the recipients of the 450 MW paid. It is apparent that in the course of the July 24, 1970 conversation Luce expected that Con Edison would have to make some payment to the AEC. Defendant's change of position ignores that agreement to reimburse plaintiff. Thus, although Con Edison's representations were not fraudulent in the classic sense, its conduct was such that it is now estopped from raising the bar of the Statute of Frauds. *Oxley v. Ralston Purina Co.,* 349 F.2d 328, 336 (6th Cir. 1965).

■ Second, Con Edison argues that there can be no estoppel since it never represented to the AEC that it would pay AEC costs as assessed by the AEC. It is settled that an unequivocal representation is a vital aspect of equitable estoppel. *Kearns Coal Corp. v. U. S. Fidelity & Guaranty Co.,* 118 F.2d 33, 35–36 (2d Cir.), *cert. denied,* 313 U.S. 579, 61 S.Ct. 1099, 85 L.Ed. 1536 (1941). However, the evidence shows that Con Edison did agree to pay costs as assessed by the AEC. In the July 24, 1970 conversation, Quinn informed Luce that the AEC was in the process of calculating the surcharge amount. Although Con Edison was under the mistaken impression that the recipients of the 450 MW had paid a twenty percent charge, Con Edison never confirmed that figure with the AEC. Indeed, the Court rejects the notion that Luce and Quinn agreed that Con Edison would pay only what the prior recipients paid, since in

the July 24 conversation Quinn explained to Luce that the 200 MW reduction would be more expensive than was the 450 MW reduction. Since Luce was told that the AEC was calculating the surcharge, he was on notice that the amount could turn out to be different from any previous charge to others. Con Edison's acceptance of the power under these circumstances, without taking any steps to discuss or to confirm the amount of costs, constituted a representation to the plaintiff that Con Edison would indeed pay those costs as calculated by the AEC.

These actions by the defendant led to plaintiff's release of the 200 MW. As the factual discussion indicates, it was reasonable for the plaintiff to proceed with the release of power in reliance upon the July 24 oral agreement. The power crisis was very real and time was of the essence. Each of the contacts between the parties indicated to the AEC that Con Edison was primarily concerned with obtaining the power and transmitting it to New York. The AEC had informed Con Edison that it would incur costs by making a further reduction of consumption at the gaseous diffusion plants. Thus, plaintiff's reliance upon defendant's representations was reasonable under the emergency conditions which prevailed. See *Twentieth-Century Fox Film Corp. v. National Publishers, Inc.*, 294 F.Supp. 10, 12 (S.D.N.Y.1968).

Nor was plaintiff's reliance rendered unreasonable by its failure to terminate the power flow upon Con Edison's objection to the 5.41 mills surcharge. Con Edison lodged its objection as early as August 10, 1970; both parties knew that Con Edison needed the power for the remainder of the summer. Con Edison never stated that it would refuse to pay altogether; nor did it ever seek to return the power. Indeed, at the September 1, 1970 meeting, George Quinn reminded Luce that Con Edison was free to return the power. Con Edison elected to go forward. Thus the Court rejects defendant's argument that the plaintiff is estopped from suit on this claim; rather, it is apparent that the AEC continued to permit the power reduction in reasonable reliance upon Con Edison's conduct.

As the factual discussion indicates, plaintiff relied thereon to its detriment. Even defendant's own expert witness conceded that the 200 MW reduction resulted in some loss to the AEC; it is uncontroverted that the AEC was unable to produce 126,000 SWUs by reason of the power reduction. Thus, detrimental reliance is present. See *Freedman v. The Concordia Star*, 250 F.2d 867 (2d Cir. 1958).

### Quasi-Contract

■ In order to prevail on its fourth claim for relief, plaintiff must demonstrate that it rendered a service to the defendant under circumstances where the defendant had reason to understand that the service was for Con Edison's benefit and that it was not rendered gratuitously. Plaintiff must also show that the defendant was unjustly enriched by reason of plaintiff's services. See *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 116–119, 479 F.2d 201, 208–11 (1973); *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970).

The evidence is clear that Con Edison had reason to understand that the AEC was not acting gratuitously. As found by the Court above, there was no gratuitous offer by the White House or by any other agency of the plaintiff. The July 24, 1970 conversation between Luce and Quinn placed Con Edison on notice that the AEC was concerned about its costs and that it would look to Con Edison for reimbursement.

■ Defendant first argues that there can be no contract implied in law since the plaintiff allegedly continued its performance in the face of Con Edison's repudiation. See Restatement of Contracts, Section 352. However, the law is clear that a party cannot assert that it has repudiated the contract while continuing to accept its benefits. See *Tibbetts Contracting Corp. v. O & E Contracting Co.*, 15 N.Y.2d 324, 338, 258 N.Y.S.2d 400, 206 N.E.2d 340 (1965). Here the defendant continued to accept the 200 MW even after the AEC made clear

that it could return the power at any time. Further, the Court finds that Section 352 of the Restatement is inapplicable here since Con Edison never clearly repudiated the agreement.

Defendant had devoted much effort in attempting to prove that it was not unjustly enriched by the receipt of the 200 MW. Con Edison asserts that it paid the fair market value for the power, and further that it made no profit on the resale of the 200 MW.

The court rejects these arguments as constituting a remarkably narrow view of the events which transpired in the summer of 1970. Charles Luce's testimony makes clear that Con Edison regarded the Ravenswood crisis as a most serious emergency. He testified that the 200 MW had a beneficial impact upon Con Edison's goodwill and upon the value of its securities. There can be little doubt that the actions of the plaintiff saved Con Edison from a major power disaster. That Con Edison might not have made money on the resale of the power does not mean that it did not benefit by the release. The Court also rejects Con Edison's argument that it paid the fair market value for the 200 MW. The evidence makes abundantly clear that Con Edison could find no other source to provide the 200 MW. As this Court observed in its decision denying summary judgment, the cost of production and transmission can hardly be equated to the fair market value of 200 MW in a market where there are no such amounts of electricity available for long-term purchase. Thus, although the enrichment here is not of the type usually presented, the Court concludes without difficulty that Con Edison was benefitted by the release of the 200 MW.

### Emergency Assistance

In reliance upon the recent decision of the Circuit Court in *Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.*, 553 F.2d 830 (2d Cir. 1977), plaintiff asserts that Con Edison is liable for the

AEC's costs because the AEC fulfilled Con Edison's duty to provide the New York area with electricity under emergency conditions and with the clear intent that it be reimbursed.[13] The Court agrees.

Under the doctrine of emergency assistance, plaintiff must establish that the defendant had a duty to provide electricity; that the plaintiff took that duty upon itself with intent to charge therefor; and that the services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety. Restatement of Restitution, Section 115; see *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 204, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

In *Peninsular & Oriental, supra*, a seaman on board the S.T. OVERSEAS PROGRESS fell ill with what appeared to be a heart attack; the vessel had no doctor aboard. Following a second apparent heart attack, the vessel radioed for assistance. The S.S. CANBERRA answered the call and diverted its course. Since the CANBERRA was equipped with a hospital and since it was a much faster vessel, the parties agreed that the CANBERRA would take the ill seaman aboard and transport him to New York. In the course of its diversion, the CANBERRA's captain radioed to the OVERSEAS PROGRESS that his ship's owners "may look" to the owner of the OVERSEAS PROGRESS for "reimbursement of diversion costs, medical and out of pocket expenses." 553 F.2d at 833. When the owners of the OVERSEAS PROGRESS thereafter refused to pay, the CANBERRA's owners filed suit.

The district court granted summary judgment to the defendant shipowner on the ground that the law of admiralty barred recovery for "pure life salvage". The Circuit reversed, applying principles of quasi-contract and the doctrine of emergency assistance. Judge Kaufman's opinion made clear that the court was applying a land-based principle of equity to a maritime situ-

---

**13.** Plaintiff's claim based upon the emergency assistance doctrine is a cause which sounds in quasi-contract; as such it is within the scope of Count Four.

ation. *Id.* 553 F.2d at 835. Since the OVERSEAS PROGRESS had requested assistance, the court concluded that it was liable for reimbursement of the CANBERRA's costs, "regardless of the value of the benefit actually conferred." *Id.* at 836. The court directed that judgment be entered for the plaintiff in the full amount of its expenses, but the decision made no provision for interest.

 Plaintiff makes a persuasive argument that the principles set forth in *Peninsular & Oriental* are controlling here. The evidence at trial demonstrates that Con Edison had a duty to provide electricity; the government undertook to provide electricity in a true emergency situation with a clear intent to be compensated for its costs; and the service supplied were necessary for public health and safety.

Con Edison argues that the doctrine of emergency assistance does not apply since it had no legal duty to provide electricity and since the power crisis was not the type of emergency required by the emergency assistance doctrine. The court finds to the contrary. Charles Luce testified that Con Edison is held responsible for providing electricity to New York; Bertram Schwartz, while refusing to admit of a legal duty, conceded that Con Edison was under a duty to make best efforts to provide power.

Con Edison, without citation of any direct authority on the question, seeks to distinguish between a "legal" duty and the type of duty which it concedes in this case. The Court finds no such distinction applicable here. Nor can the Court agree with defendant that the power crisis was not the type of emergency covered by the equitable principle recited above. Indeed, if Con Edison had no duty to its customers, and if the situation were not an emergency, then Con Edison simply could have disconnected customers. Instead, in three days of frenzied activity by its highest officers, Con Edison sought out all possible sources of power and accepted 200 MW from the federal government in the face of the AEC's clear indication that the AEC would seek recovery of its costs. Had the matter not been a true emergency to public welfare and safety, Con Edison could have simply "shed load". Thus, the Court finds the arguments presented on behalf of defendant to be at odds with the actions of its officers during the time at issue.

The Court also rejects defendant's argument that the *Peninsular & Oriental* decision was one limited to the "highly specialized field of admiralty." (Deft.Memo at 6). While Judge Kaufman's opinion opens on a maritime note, it is clear that the Circuit Court was applying a land-based equitable principle to a maritime context in the face of an ancient maritime doctrine which barred recovery for "life salvage". Finally, defendant argues that the plaintiff, rather than Con Edison, initiated the plan to deliver the power to defendant. Again, the evidence is to the contrary; Con Edison requested the power from the AEC in the face of Quinn's statement that the AEC would seek to recover its costs. Indeed, Luce conceded at the September 1, 1970 meeting that Con Edison had requested the power.

In sum, the Court concludes that principles of equity run in plaintiff's favor. The fact that the recipients of the 450 MW paid no surcharge does not alter this result. A person who once renders assistance gratuitously is not forever barred from seeking compensation for its costs when it again renders assistance. By reason of the actions of the federal government, Con Edison was able to fulfill its admitted obligation to furnish electrical power to New York. It was not through the fault of the plaintiff that Con Edison's largest generator failed; nevertheless, Con Edison has sought to pass the expense of that failure on to the federal government and to the customers of the government's uranium enrichment program. As Charles Luce testified, the availability of the 200 MW had a beneficial impact upon Con Edison's valuable corporate goodwill and upon the financial holdings of its stockholders. Since the plaintiff offered assistance with the clear intent to be reimbursed, the Court con-

cludes that equitable principles of quasi-contract require that the plaintiff be made whole. Accordingly, the Court finds that defendant Con Edison is liable to the plaintiff in damages on each of plaintiff's three theories of relief.

### Damages

The Court has already discussed at length the various damages theories presented by the parties. Nevertheless, defendant Con Edison argues that since the plaintiff has passed its increased costs along to its customers, there can be no damage. Con Edison relies primarily upon an eighty-year-old decision in the Court of Claims, *Plimpton Manufacturing Co. v. United States*, 15 Ct.Cl. 14 (1897). In that case the U.S. Postal Service had counterclaimed against the plaintiff manufacturer for breach of a contract to supply stamped envelopes and newspaper wrappers. As the result of the breach, the government claimed, it was required to purchase similar goods at a higher price. Observing that federal law required the Postal Service to purchase letter and newspaper envelopes and resell them at cost, the court concluded that the United States suffered no damage by reason of the manufacturer's alleged breach. 15 Ct.Cl. at 21.

■ Like the Postal Service in the *Plimpton* case, the plaintiff's uranium enrichment program is required by statute to recover its costs. 42 U.S.C. § 2201(v)(B). However, it is apparent that the government can sue and be sued on contract claims arising out of its uranium enrichment program. See *Industrial Uranium Co. v. United States*, 376 F.2d 868, 180 Ct.Cl. 50 (1967); *Gay v. United States*, 356 F.2d 516, 174 Ct.Cl. 420, *cert. denied*, 385 U.S. 898, 87 S.Ct. 202, 17 L.Ed.2d 130 (1966); *Moran Brothers, Inc. v. United States*, 346 F.2d 590, 171 Ct.Cl. 245 (1965). Under 28 U.S.C. § 1345, which grants this court jurisdiction to try this action, the government is to be treated as any other business entity. See *United States v. City National Bank & Trust Co.*, 491 F.2d 851, 854 (8th Cir. 1974). Certainly the fact that the defendant Con

Edison is able to pass certain costs along to its electricity customers would not foreclose it from bringing a lawsuit to recover on a breach of contract. As noted by counsel for the government, if the uranium enrichment program could not bring suit upon its contracts, those contracts would be meaningless. Further, a recovery here will not constitute a windfall; rather, the evidence is clear that in the event of a recovery, the government will be required under statute to pass such monies on to the customers of its enrichment program, by adjusting the price charged.

■ While a defendant on a contract claim is normally entitled to take advantage of any events, such as resale, which have mitigated plaintiff's losses, here the government is standing in the shoes of its uranium enrichment customers. Under 42 U.S.C. § 2201, a recovery in this action will accrue to their benefit. Indeed, the plaintiff here is in a position comparable to that of a subrogor who brings a lawsuit in its own name notwithstanding the fact that it has been compensated by its insurance carrier. Thus, the Court rejects the notion that the plaintiff has not suffered any legal loss.

Turning to the amount of damages, defendant argues that since it received no tangible benefit there can be no finding of the amount of damages. The Court rejects this argument. Where the benefit to the defendant is not capable of exact valuation, the courts have commonly measured plaintiff's damages by reference to the value of the services rendered, or by measurement of the plaintiff's costs incurred. See *Peninsular & Oriental, supra; Campbell v. Tennessee Valley Authority*, 421 F.2d 293 (5th Cir. 1969).

■ Further, when a plaintiff prevails on an equitable contract claim, the courts have made reference to the alleged contract to assess damages. Here the promise was to pay the AEC's costs; reference to Con Edison's promise may be made for measuring damages under both contract by estoppel and quasi-contract. See *United States v. Brotherton*, 106 F.Supp. 353 (S.D.N.Y.

1952); Williston, *supra*, §§ 1458, 1459. Accordingly, the Court concludes that the appropriate measure of damages here is plaintiff's actual costs.

For the reasons stated in the prior section, the Court concludes that PX–41 represents plaintiff's actual costs. The loss of 126,000 SWUs is uncontroverted. The evidence does not support defendant's claim that plaintiff can suffer no loss until it runs out of SWUs; the claim that the loss suffered here is covered by the plaintiff's contingency pricing system is also unsupported by competent evidence.

Doctor Geller's "efficiency loss" calculation (DX–U–9) is rejected since Con Edison agreed to pay more than the costs incurred by the less efficient use of electrical power. Rather, as stated above, Con Edison agreed to pay the surcharge as calculated by the AEC. The averaged surcharge method (DX–X–9) is inadequate to reflect the AEC's actual costs since it calculates an averaged charge rather than actual costs resulting from the reduction from 1,550 MW to 1,350 MW. Quinn made it quite clear to Luce in the July 24 conversation that the drop to the lower megawatt level would be more expensive.

The "threshold method" (DX–Y–9) is rejected since the evidence does not support the conclusion that either the AEC or Con Edison expected the surcharge to be based on some incremental cost above and beyond the comparable cost to the AEC by reason of the 450 MW reduction; it is clear that the AEC was not offering gratuitous assistance in any respect. Doctor Geller's final calculation (DX–W–9) is faulty since it is based upon 1971 estimates which have not survived the test of time.

Particularly because the defendant did not effectively challenge the data basis of PX–41, and in light of the conceded fact that even 1.5 million dollars would not now make up the loss of 126,000 separative work units of enriched uranium, the Court concludes that damages should be assessed at the amount set forth in plaintiff's unit cost calculation, PX–41. Accordingly, defendant Con Edison is liable to the plaintiff for $1,576,795.00 in damages on each of the three theories of relief alleged.

### Interest

Plaintiff seeks pre-judgment interest on the ground that the amount sought was sufficiently definite to place Con Edison on notice of the sum. Plaintiff relies upon the comments to Section 156(b) of the Restatement of Restitution, which provide as follows:

"Ordinarily if the sum due is sufficiently definite so that the transferee would have reason to know the amount he should pay, it would be unjust not to allow interest from the time when it should have been paid . . . ."

The Court cannot agree that the amount of damages awarded here was sufficiently definite to put Con Edison on notice thereof. Plaintiff originally sought a surcharge of 5.41 mills (PX–13). Following meetings on August 10, 1970 and September 1, 1970, the AEC made recalculations of PX–13 to correct clear errors in the surcharge computation. Later the AEC considered the imposition of an averaged surcharge. When plaintiff filed its complaint herein, it again sought a 5.41 mills surcharge. Plaintiff's evidence at trial has demonstrated that its actual losses were more in the area of a 4.79 mills surcharge. This sequence indicates that Con Edison cannot be said to have been on notice of the exact amount sought.

Particularly where the recovery is based upon equitable principles, the court has broad discretion in fashioning an award of interest if any. As stated by the Supreme Court in *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941),

"the rule governing the interest to be recovered as damages for delayed payment of a contractual obligation to the United States is not controlled by state statute or local common law. In the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in

terms of interest, for non-payment of the amount found to be due." (*Id.* at 296, 61 S.Ct. at 997; see *United States v. Seaboard Surety Co.*, 339 F.2d 1 (2d Cir. 1964).

 The recent decision of the Circuit Court in *Peninsular & Oriental, supra,* indicates that interest is not routinely awarded on quasi-contract claims. As in this case, in *Peninsular & Oriental* the defendant raised substantial legal defenses to the lawsuit. Here the amount of AEC losses was not proven until trial; indeed, PX–41 was not developed by the plaintiff until 1977. Further, plaintiff's long delay in filing this action militates against any award of interest. See *Redfield v. Ystalyfera Iron Co.,* 110 U.S. 174, 3 S.Ct. 570, 28 L.Ed. 109 (1884). The fact that the evidence is equivocal with respect to whether Con Edison made money on the resale of the 200 MW also militates against an interest award. See *United States v. Sanborn,* 135 U.S. 271, 10 S.Ct. 812, 34 L.Ed. 112 (1890). Finally, it cannot be said that defendant's resistance to this lawsuit was in bad faith.

Accordingly, due to the factual circumstances presented in the underlying transaction, and in light of plaintiff's delay in prosecution, the Court concludes that the principles of equity do not justify an award of interest in this action. Accordingly, plaintiff's application for pre-judgment interest is denied.

For the foregoing reasons, judgment should be entered for the plaintiff United States of America for damages against defendant Consolidated Edison Company of New York, Inc., in the amount of $1,576,-795.00, without interest. Plaintiff shall also recover its costs. Counsel for the plaintiff is directed to submit an appropriate order of judgment, on five days notice, in accordance with the decision of the Court.

SO ORDERED.