**UNITED STATES of America,**
**Plaintiff-Appellee-Cross-Appellant,**

v.

**·CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC.,**
**Defendant-Appellant-Cross-Appellee.**

**No. 672, Docket 77–6168.**

United States Court of Appeals,
Second Circuit.

Argued March 10, 1978.

Decided June 26, 1978.

Werner L. Polak, New York City (Thomas M. Geisler, Jr., and Shearman & Sterling, New York City, of counsel), for defendant-appellant.

Gary G. Cooper, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Louis G. Corsi, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellee.

Before WATERMAN and OAKES, Circuit Judges, and WYZANSKI,* District Judge.

OAKES, Circuit Judge:

This is an appeal by Consolidated Edison Co. of New York, Inc. (appellant or Con Edison), and a cross-appeal by the United States (appellee or Government), from a September 20, 1977, judgment of the United States District Court for the Southern District of New York, Lawrence W. Pierce, *Judge*, awarding damages to the United States in a contract action. After a two-week bench trial, the court found that Con Edison was estopped from denying the existence of a contract to reimburse the Government for costs which the Atomic Energy Commission (AEC) incurred when it

made available 200 megawatts (MW) of electric power to Con Edison during a serious Con Edison power shortage in the summer of 1970. The district court further premised liability on two-quasi-contractual theories—the "emergency assistance" doctrine and a theory of unjust enrichment resulting from the AEC's conferral of a benefit on Con Edison. Damages were awarded in the sum of $1,576,595, all three theories of liability producing the same ultimate result. Because we are satisfied both that liability is properly imposed under the emergency assistance doctrine and that the AEC would achieve its maximum damages award under that theory, we affirm the district court's imposition of liability without deciding the correctness of its equitable estoppel or unjust enrichment theories or its dismissal of the Government's contract claim on statute of frauds grounds. However, we find the district judge's treatment of the damages issue improper in one respect and accordingly modify the damages award.

## I. Facts

In the spring of 1970, the Government was rightfully concerned that the nation's public utilities might be unable to satisfy peak public demands for electrical power during the coming summer. An interagency task force established by the Executive Office of the President, therefore, adopted a plan of emergency power assistance (May 5 plan) in which the AEC was to play a major role. After studying the problem and considering the impact of a reduction in power consumption on the operations of the AEC's gaseous diffusion plants,[1] that agen-

---

* Of the District of Massachusetts, sitting by designation.

1. The plants were located in Oak Ridge, Tennessee, Portsmouth, Ohio, and Paducah, Kentucky. In 1970 these plants were being used primarily to enrich uranium for use in commercial nuclear power plants. The gaseous diffusion plants convert natural uranium into a gaseous state. The gas is then passed through hundreds of processing stages or "cascades" to increase the concentration of isotope U-235. Since each stage effects only a slight increase in the concentration of U-235, large quantities

of electrical power are required to achieve any amount of enrichment. The unit measure of the amount of enrichment or "separation" work performed is called a "separative work unit," or "SWU." By thus enriching uranium for future power use the electricity utilized as one step in the enrichment process is in a real sense "stored." Thus at the outset the case is different from the usual situation of one electric utility supplying another with emergency power in that unless the supplier finds an outlet for its power the power is forever lost since energy in the general sense cannot be saved. Here the supplier (AEC, via its supplying utili-

cy determined that it could reduce consumption of power at these plants by up to 450 MW if there were critical shortages of electricity in the commercial sector. In late June, 1970, the AEC executed modifications of its requirements contracts then in force with the three utilities which supplied electricity to these plants to reduce the AEC's overall power consumption by 450 MW for the duration of the summer. Thereafter, in early June, 1970, the released power was wheeled from the supplying utilities to utilities facing anticipated shortages in Chicago and other areas in the Midwest and East.

On July 21, 1970, Con Edison suffered a major power crisis with the outage of its Ravenswood Plant ("Big Allis") resulting in a loss of 1,000 MW.[2] Charles Luce, Con Edison's chairman and chief executive officer, and his staff immediately began the search for new sources of electrical power.

Concurrently, the gravity of the New York situation had come to the attention of government officials as well. On July 22, David Freeman of the Office of Emergency Preparedness (OEP) in Washington, D. C., telephoned Con Edison and indicated that the Government might be of assistance. On July 23, 1970, Luce himself called Freeman who explained that although the AEC had already made one power reduction, he believed that a further power release to Con Edison might still be possible. Luce indicated that Con Edison wanted the pow-

er; Freeman directed Luce to get in touch with George Quinn, then assistant general manager in charge of production at the AEC, in order to "work out the details." 452 F.Supp. 638 (S.D.N.Y.1977). The district judge specifically found that the Luce/Freeman conversation constituted "only preliminary discussions."

Luce also telephoned Fred Chambers, a Tennessee Valley Authority (TVA) official, to inquire about the availability of power from TVA and to determine what TVA knew of the AEC's ability further to reduce its power from TVA. Chambers was uncertain. After the phone call, Chambers conferred with his staff to determine whether TVA could assist; he called the manager of the AEC's gaseous diffusion plant at Oak Ridge, who later told Chambers that a further power reduction would cause the AEC severe efficiency losses—which could be estimated in the neighborhood of three to seven mills per kilowatt hour (PKH). Chambers then called back Luce, informing him that the TVA could not assist and that if the AEC ultimately determined that it could release additional power, the cost would be quite high. He specified that actual costs of the power itself and the efficiency loss surcharge would likely be in the twelve to fourteen mills PKH range, although a final determination of the price would have to attend AEC calculations.[3]

ties) is in the business of utilizing power for storage purposes; it is a manufacturer who uses the energy for manufacturing purposes. The release of some of that energy increases the cost per unit not only of the electricity utilized in the manufacturing process but of the manufactured product itself.

2. Previously on May 20, 1970, Con Edison lost its smaller Indian Point unit, a nuclear power plant generating 260 MW. Indian Point and Big Allis together accounted for approximately 14% of Con Edison's electrical generating capacity.

3. In the meantime, Quinn had informed OEP that AEC intended to impose a surcharge upon the Con Edison power release. The OEP apparently did not object and then issued the following press release:

The President announced today that the Atomic Energy Commission will take immediate action to make available several hun-

dred megawatts of power to the Consolidated Edison Company serving New York City.

This action is being taken to help relieve the critical power shortage in New York City created by the failure of its largest generating unit on July 21.

The release of this power is pursuant to the contingency plans previously developed and announced by the Office of Emergency Preparedness on May 5.

The power would be available by reducing the use of electricity at the AEC's gaseous diffusion plants. The Consolidated Edison Company is proceeding with the necessary arrangements with the other utility companies involved and the AEC.

It is expected that the power will be transmitted to New York over the interconnected grid system of the utilities in the Eastern United States.

On July 24, 1977, Quinn spoke with Luce on the telephone:

Quinn stated that he wanted to discuss the terms and conditions of the release and that the AEC was now in the position to offer 200 MW to Con Edison. Quinn informed Luce that AEC had made a previous reduction of some 450 MW, and that while AEC would prefer not to make a further reduction, they were willing to do so. It is undisputed that Quinn informed Luce that in the event the release was effected, the AEC would look to Con Edison for reimbursement of its additional costs. Luce stated that Con Edison was still studying their end of the transmission problem and that he was not yet in a position to request the power. Apparently unconcerned with the possibility of a surcharge, Luce stated that Con Edison would be willing to pay whatever surcharge had been paid by the recipients of the previous 450 MW reduction. Quinn did not inform Luce that the recipients of the 450 MW had not been asked to pay any surcharge.

Quinn stated that the amount of the surcharge was under study and that he could not fix a price at that time. However, Quinn did give Luce examples of the type of costs the AEC would incur, such as the shut down of certain equipment. Luce testified that Quinn referred to efficiency losses. On cross-examination . . . and in response to questions by the Court . . . , Charles Luce stated that Quinn had explained to him that the 200 MW reduction would result in higher costs to AEC than did the 450 MW reduction, since the incremental losses were greater when the plants were required to reduce consumption to as low as 1,350 MW. The conversation ended [4] with Quinn's advice to Luce that if Con Edison wished to receive the power it should make arrangements with AEC's supplier utilities, TVA and OVEC.

452 F.Supp. at 645 (citations omitted). This telephone conversation was the last direct AEC/Con Edison contact before the 200 MW of released power began to flow on Monday, July 27, 1970.

By Tuesday, July 28, 1970, the controller's office of the AEC calculated a surcharge of 5.41 mills, or .0541 cents PKH on the power released to Con Edison. Quinn reviewed this calculation and discussed it with his supervisor who approved it. On July 29, 1970, Quinn directed officials at the Oak Ridge diffusion facility to initiate contract modification discussions with the AEC's supplier utilities. On August 3, 1970, the AEC executed formal contract modifications with its supplier utilities by which the AEC released its rights to 200 MW of power for the remainder of the summer. These agreements provided for the utilities to collect the 5.41 mills PKH surcharge from Con Edison through the billing chain. Con Edison was not specifically informed of the terms of the modifications.

Con Edison first learned of the magnitude of the surcharge on August 6, 1970. Luce immediately objected and directed Louis Roddis, president of Con Edison, to ascertain the amount of the surcharge paid by the recipients of the 450 MW reduction. Roddis learned that the 450 MW utilities had paid no surcharge at all. Roddis telephoned Quinn to inquire whether the surcharge had the support of the AEC Commissioners and to suggest that the surcharge might cause political embarrassment for the AEC and the White House. The district court found that Roddis at no point suggested that Con Edison might terminate its receipt of AEC released power.

On August 10, 1970, Bertram Schwartz, then a Con Edison vice president, met with

The district court found that this release did not constitute an agreement of the parties but was simply a press release.

4. Luce testified that before the conversation with Quinn ended he reiterated that it would not be appropriate for Con Edison to pay a different surcharge from that paid by the 450 MW utilities. While Luce's testimony is not explicitly discounted by the judge, he apparently chose not to credit it.

What is important is that Luce understood enough of the AEC's situation to know that the power release would cost the AEC additionally in its SWU production.

Quinn and among other things asked why the AEC had imposed no surcharge upon the recipients of the prior reduction. Quinn told him that it was an oversight and that the AEC was seeking to renegotiate the agreements with the 450 MW recipients to include a surcharge. The negotiations to reopen the written contracts ultimately proved fruitless.

In the meantime, Con Edison continued to assert that the only payment it would make was a surcharge equivalent to what the recipients of the 450 MW power release had paid. This position was reiterated in a meeting between Quinn and Luce on September 1, 1970. Despite Con Edison's protestations throughout the summer at having to pay a surcharge different from what had been imposed on the 450 MW utilities, no Con Edison official ever intimated that it preferred not to take the power.

By letter dated September 30, 1970, after compromise attempts had failed, Luce informed the AEC that Con Edison would not pay the surcharge. On the next day, October 1, 1970, Con Edison released the 200 MW of power back to the TVA for return to the AEC. The district court found:

Defendant never advised the AEC that it would refuse to pay a surcharge altogeth-er [until September 30, 1970,] nor did Con Edison ever state that it would stop accepting the power. It is clear from the record that during this period Con Edison knew that AEC was demanding compensation for its increased costs; indeed, it knew as early as August 6, 1970—only ten days after the power had begun to flow,—the magnitude of the surcharge sought by AEC.

452 F.Supp. at 650.

The district judge then went on to find that "the July 24, 1970 [oral] conversation between Quinn and Luce was sufficiently definite to form an agreement," but that it was unenforceable by virtue of the statute of frauds. Accordingly, he dismissed the Government's contract claim.[5] Nevertheless, he upheld the Government's equitable estoppel and quasi-contract theories.[6]

## II. Liability

We agree with Judge Pierce that Con Edison is liable for the AEC's costs under the emergency assistance doctrine. Recovery on this theory affords the Government the greatest amount of damages to which it could rightfully lay claim under any of the theories that it advances.[7] Ac-

5. If there were an enforceable agreement arising out of the July 14, 1970, Quinn/Luce telephone conversation, it would have to have been on the terms claimed by the Government. The AEC offered to make available to Con Edison 200 MW of power and expected Con Edison to pay AEC's costs. Luce's reply that Con Edison would pay the same surcharge as the utilities purchasing the first 450 MW may be treated as a counter-offer. If the conversation had stopped here, the contract would have been formed, if at all, on the terms that Con Edison urges. However, Quinn went on to inform Luce that the surcharge to Con Edison would be *different* from that of the other utilities because the 200 MW's which Con Edison would receive were more expensive to the AEC than the 450 MW it had already relinquished. Accordingly, whether the surcharge to the other utilities was zero or two mills or four mills would be irrelevant.

6. In reviewing the district court's decision, we are of course bound by its findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *see Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 23

L.Ed.2d 129 (1969); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 43 (2d Cir. 1978); *Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 550 (2d Cir. 1977).

7. If there were a valid enforceable contract, the most that the AEC could claim as damages would be its efficiency-loss costs since that is what the AEC bargained for during, for example, the July 24, Quinn/Luce telephone call. A similar result would obtain on the Government's equitable estoppel claim: to recover on such a claim, the Government must show reasonable induced reliance resulting in a detriment to it. Under any conceivable measure of damages, the AEC's greatest detriment would be its efficiency-loss costs. *But see* note 20 *infra.* Finally under one of the Government's two quasi-contractual theories—that of unjust enrichment—it is hard to see what type of uncompensated-for benefit Con Edison has retained which it might disgorge: it has utilized the power furnished; that power is no more. Unjust enrichment in the ordinary sense does not appear to us to be a satisfactory rubric of analysis for this case.

cordingly, we see no reason to decide these other interesting, but unnecessary, issues which have been presented, and therefore confine our discussion to Con Edison's liability under the emergency assistance doctrine.

The emergency assistance doctrine is a form of quasi-contractual relief. As recognized in several cases, including a recent case of this circuit,[8] the doctrine is embodied in Section 115 of the Restatement of Restitution:

A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if

(a) he acted unofficiously and with intent to charge therefor, and

(b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety.

The basis for recovery in this case is that the AEC performed Con Edison's duty to acquire and maintain adequate supplies of electrical power under emergency conditions with the clear intent that it be reimbursed for its costs.[9] *See Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.,* 553 F.2d 830 (2d Cir.) (liability under Section 114 of Restatement of Restitution, the *private* assistance analogue of Section 115's *public* assistance

statement), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977).

Con Edison challenges recovery under this doctrine on a number of grounds. It asserts that Con Edison had no absolute duty to supply electricity to its New York area customers; it challenges the scope of the doctrine and whether a true emergency in the Section 115 sense existed; and it attempts to distinguish the leading Second Circuit authority, *Peninsular & Oriental, supra,* by limiting that case not only to its admiralty context but also to its precise facts. We are unpersuaded by Con Edison's contentions.

Con Edison's claim that it has no absolute duty to supply electricity to New York area customers misconceives both the nature of the duty which must be implicated to fall within the purview of Section 115 and the nature of the duty which the AEC performed in this case. Con Edison asserts in this regard that it is liable for damages to its customers only from intentional wrongful cutoffs or accidental cutoffs when it has acted with gross negligence.[10] However, Section 115 of the Restatement certainly does not require either by its terms or under the case law interpreting it, that a duty must be absolute to fall within its parameters. Duty is a flexible concept. Its existence depends on calibrating legal obligations to factual contexts. One may have only a duty to avoid gross negligence, but

**8.** *Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.,* 553 F.2d 830 (2d Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977).

**9.** *Peninsular & Oriental* did not require that the party rendering assistance act "without the other's knowledge or consent." *See* Restatement of Restitution §§ 114, 115. Apparently the court read this language as impliedly permitting recovery of costs *even when* the aided party either had no knowledge or had not consented to the assistance. Here, of course, Con Edison knew of the assistance and consented to it. Indeed, they eagerly sought it. *See post* at p. 1129. Perhaps a closer analytical basis for the imposition of liability in *Peninsular & Oriental,* where a benefit was conferred upon request, but without a bargain being struck, is the theory set forth in Restatement of Restitution § 107(2) and Restatement of Contracts

§§ 226–36 and 245–49, but for our purposes it is sufficient that *Peninsular & Oriental* follows the emergency assistance doctrine.

**10.** Under New York law, Con Edison is not liable for damages resulting from ordinary negligence. In July, 1970, the New York State Public Service Commission approved as part of Con Edison's rate schedule an exemption for ordinary negligence in the valid exercise of Con Edison's powers and also for interruption of services from causes beyond Con Edison's control. This exculpation has been upheld by several New York courts. *E. g., Newman v. Consolidated Edison Co.,* 79 Misc.2d 153, 360 N.Y. S.2d 141 (Sup.Ct.1973); *Devers v. Long Island Lighting Co.,* 79 Misc.2d 165, 359 N.Y.S.2d 940 (Sup.Ct.1974). *But see Danna v. Consolidated Edison Co.,* 71 Misc.2d 1029, 337 N.Y.S.2d 722 (Civ.Ct.1972).

**1128**

that is a duty nonetheless and one potentially cognizable by the emergency assistance doctrine.

*Peninsular & Oriental* is a good illustration of a situation where less than an absolute duty was held governable by the emergency assistance doctrine. In that case, a sailor on the Overseas Progress was stricken with a heart attack. The Overseas Progress did not have a doctor or the necessary facilities to give the sailor proper medical attention and therefore sent a radio message seeking assistance from other ships in the vicinity. The S.S. Canberra responded, changing course to intercept the Overseas Progress. The rescuing ship, which had an on-board hospital, took the heart attack victim on board and increased its speed and thus its fuel consumption as it plied toward New York.[11] This court found that when the seaman took ill the Overseas Progress "became obligated to make reasonable efforts to provide him with swift medial care . . .. On vessels that do not carry a surgical staff, the ship's master has a duty, in the sound exercise of his judgment and depending on the circumstances, to have the seaman taken speedily to a hospital or the nearest port where surgical care may be obtained." *Id.* at 834. While the Overseas Progress did not have an absolute duty to provide the sailor with medical attention, it had a "manifest duty" to do so. *Id.* at 835.

Similarly, Con Edison had, if not an absolute, at least a manifest, duty to provide its customers with electricity. *See, e. g., Park Abbott Realty Co. v. Iroquois Natural Gas Co.,* 102 Misc. 266, 168 N.Y.S. 673 (Sup.Ct. 1918) (utility must use best efforts), *aff'd* 187 App.Div. 922, 174 N.Y.S. 914 (4th Dep't 1919). And as the district court found, based on the testimony of Con Edison's own officials, Con Edison has a general responsibility to provide electricity, one founded in its monopoly and the public service nature of its business. *See Wolff Packing Co. v. Industrial Court,* 262 U.S. 522, 535–36, 43

S.Ct. 630, 67 L.Ed. 1103 (1923); *Munn v. Illinois,* 94 U.S. 113, 124–30, 24 L.Ed. 77 (1876). Moreover, under the statutory law of New York Con Edison has a duty to "furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable. . . ." N.Y.Pub.Serv.Law § 65(1) (McKinney 1955). Distinguishing its general duty to provide service from an absolute legal duty to pay damages to individual customers in particular circumstances would be hypertechnical and would ignore Con Edison's overriding responsibilities to the public. *See People ex rel. Cayuga Power Corp. v. Public Service Commission,* 226 N.Y. 527, 532, 124 N.E. 105, 106 (1919) (Cardozo, J.) (emphasizing that "[t]he duty to serve the public goes hand in hand with the privilege of exercising a special franchise . . .."). Since Con Edison was willing to pay a surcharge of the magnitude ultimately imposed by the district judge if the other utilities had paid an identical surcharge, it is clear that Con Edison itself believed that incurring such costs was well within the parameters of its manifest duty to provide electrical power to its customers.

The nature of Con Edison's duty to its customers aside, Con Edison also misperceives the nature of the duty which the AEC actually performed in this case. Con Edison improperly focuses exclusively on the Con Edison-customer relationship rather than on the Con Edison-AEC relationship. While Con Edison may be liable to its customers for damages from wrongful intentional cutoffs or accidental cutoffs when it has acted with gross negligence, that limitation on Con Edison's duty relates solely to damage claims between Con Edison and its customers for failure to supply electricity; it does not foreclose liability arising from a relationship between Con Edison and *its* supplier of electricity. The generalized duty to furnish electricity that flows from Con Edison's status as a government-

11. The sailor ultimately recovered. To effect the rescue, the S.S. Canberra not only increased its fuel consumption by increasing speed, but it also went some 232 miles out of

its way. The court awarded the rescuing ship its increased fuel costs as damages. *See Peninsular & Oriental, supra,* 553 F.2d at 836–37 & n.7.

regulated public service company imposes upon it the additional duty to make reasonable efforts to acquire additional electricity in time of need. This duty of acquisition, even if the ultimate object were to fulfill the separate duty of supplying its individual customers, is an independent obligation of Con Edison.

Con Edison's actions, moreover, belie its claim of no duty. Company officials went to significant (and we may say commendable) efforts to secure additional power. Luce and Chambers testified that Con Edison actively explored reactivation of an obsolete, expensive TVA steam generation system. The district court found: "[I]n three days of frenzied activity by its highest officers, Con Edison sought out all possible sources of power and accepted 200 MW from the federal government in the face of AEC's clear indication that the AEC would seek recovery of its costs." 452 F.Supp. at 656.

In sum, then, we conclude that Section 115, with the gloss of *Peninsular & Oriental*, is not limited to cases of absolute duty, that in any event the proper focus here is on the Con Edison-AEC relationship rather than the Con Edison-customer relationship and that Con Edison had a manifest duty to acquire electrical power. We, therefore, reject Con Edison's contention that the AEC did not perform Con Edison's duty.[12]

Con Edison's second principal objection to the Government's recovery under the emergency assistance doctrine is that recovery here improperly widens the concept of emergency. The thrust of Con Edison's contention is that while Con Edison confronted a very serious problem, it was not a problem of emergency dimensions within the contemplation of Section 115.

Specifically, Con Edison points out that Section 115 requires that the lack of electricity pose a threat to "public decency, health, or safety." Con Edison faced just such a threat during the summer of 1970. Even though Con Edison received 200 MW of AEC-released power which, as the district court found, constituted three per cent of Con Edison's peak load requirements, there were still "fourteen separate days during the summer of 1970" when "Con Edison reduced voltage by between three and five per cent." Bertram Schwartz testified in this regard that "when a voltage reduction goes as far as eight per cent, Con Edison's contingency plan is to begin load shedding."[13] On "six separate days between July 27, 1970 and September 28, 1970, Con Edison's reserve capacity was well under 200 MW. Indeed even with the 200 MW Con Edison was compelled to engage in eight per cent voltage reductions on three different days, and on September 22, 1970, Con Edison did in fact shed load." An eight per cent voltage reduction is no light matter. Load shedding is the equivalent of designated area blackouts.

12. It is also clear that the AEC sought to perform Con Edison's duty with intent to be reimbursed for its costs. Con Edison emphasizes of course that no one from the AEC mentioned a surcharge until the Luce/Quinn telephone call of July 24. However, Con Edison officials could not have been so disingenuous to believe that there would not be at least some surcharge, given the industry practice of 10 to 20% surcharges for emergency power supplied by other members of a power pool. Moreover, Chambers of the TVA told Luce in a July 23 conversation that power released by the AEC would be "pretty expensive . . . because the AEC does have an efficiency factor," and "this can turn out to cost you 12 or 14 mills a kilowatt hour." In addition, Quinn specifically told Luce in their July 24 conversation that the AEC expected to be paid a surcharge measured by its lost efficiency. This conversation raising the surcharge issue formally occurred less than 72 hours after the crisis began and more than 48 hours before the power actually began to flow to Con Edison. In other words, at about midpoint in the development of the crisis, the surcharge question was formally placed on the bargaining table. Furthermore, the AEC never wavered from its position that it expected reimbursement, even in the face of Con Edison's political blustering. *Ante* at pp. 1125–1126. It is undeniable therefore that the AEC acted with intent to be paid its costs. *See* note 9 *supra*.

13. Load shedding is the process of disconnecting certain customers to ease the strain on the entire electrical system and to prevent a system-wide outage such as occurred most recently in the summer of 1977.

Charles Luce testified that the situation confronting Con Edison was the most serious in his ten years with the company. The district judge stated:

> Indeed, . . . if the situation were not an emergency, then Con Edison simply could have disconnected customers. Instead, in three days of frenzied activity by its highest officers, Con Edison sought out all possible sources of power . . . Had the matter not been a true emergency to public welfare and safety, Con Edison could have simply "shed load." Thus, the Court finds the arguments presented on behalf of defendant to be at odds with the actions of its officers during the time at issue.

452 F.Supp. at 656. It is easy with the aid of hindsight to say that nothing serious happened. But this ignores the fact that Con Edison operated with 200 MW of AEC released power. When the decision to accept that power was made all officials concerned recognized that the situation was grave indeed. Con Edison's argument is a little like saying that, because the seaman in *Peninsular & Oriental* did not die of his heart attack, there was no need for emergency assistance at the time the request for aid was made. We therefore conclude that Con Edison faced an emergency within the meaning of Section 115.[14]

Con Edison's attempt to limit the *Peninsular & Oriental* rationale to maritime situations and to its facts is similarly unpersuasive. As Chief Judge Kaufman's opinion made clear in that case, it was not applying some peculiarly maritime rule. On the contrary, the court took a more general equitable doctrine and applied it to a maritime context, using the opportunity to overrule specifically the outdated admiralty rule of "pure life" salvage.

Distinction of *Peninsular & Oriental* on a number of other technical grounds in an attempt to limit the holding of that case to its facts is also unavailing. Con Edison asserts that in *Peninsular & Oriental* the defendant's vessel had requested assistance from the plaintiff's vessel and had discussed the matter of reimbursement from the beginning, 558 F.2d at 833, whereas in this case, according to Con Edison, the White House made the offer of power pursuant to its May 5 plan without any mention of a surcharge. The matter, however, is not as simple as Con Edison would suggest.

First, it is not made clear why the chronology of who asked whom makes any difference. Indeed, were a rescuer to come upon a stricken victim, it is anomalous to suggest that the rescuer may be reimbursed for his costs if the victim speaks first, but not if the rescuer speaks first or presumably acts without either party speaking. True, Con Edison has seized upon a factual difference between *Peninsular & Oriental* and this case, but it is one that makes no legal difference.

■■■ Nor, for several reasons, do we find it significant that the question of a surcharge for Con Edison's efficiency-loss costs was not mentioned by a Government official to a Con Edison official prior to the Quinn/Luce telephone call of July 24. It was mentioned at about midpoint in the developing crisis; considering the rapidity with which events were unfolding and the magnitude of the problem, it is hardly surprising that the surcharge was not specifically mentioned until 2½ days after Big Allis broke down. Con Edison was formally told of the surcharge that it would be expected to pay more than two days before the power began to flow to Con Edison. Moreover, prior to the Quinn/Luce telephone call, Luce was informally told by a TVA official—Chambers—that the AEC would look to Con Edison for its efficiency-loss costs, and he indicated what he thought

---

14. Con Edison's attempted limitation of the emergency assistance doctrine to burial of the dead, repair of public roads, and quarantine of the insane and contagiously ill takes too myopic a view. To be sure, these are examples appearing in comment *b* to § 115 of the Restatement of Restitution. But those examples are explanatory, not delimiting. Con Edison's situation was certainly more grave and potentially dangerous to the public welfare than when a fallen tree blocks a road or when "a dead whale [is] stranded on the shore close to a town." Restatement of Restitution § 115, comment *c* at 483 (1937).

they might be. The Con Edison officials cannot be considered as naive as they would now have us believe. If their purpose is to undercut the AEC's demonstrated intent to be reimbursed for its costs, that effort must fail, for it is clear from the record, and the district judge unequivocally so found, that the AEC intended to be reimbursed for its costs and made that intent unmistakably clear to Con Edison. *See* note 12 *supra.* Accordingly, we conclude that liability was properly imposed pursuant to the emergency assistance doctrine.[15]

### III. Damages

■ The proper measure of AEC's damages is the costs it incurred in assisting Con Edison.[16] We further conclude that these costs are fairly embodied in Plaintiff's Exhibit 41 (PX 41) as modified herein.[17] The purpose of PX 41[18] is to measure increased production cost per SWU which accrued as a result of the power reduction at the AEC's gaseous diffusion centers. The incremental cost per SWU was computed to be $1.9163. Since 822,833 SWU's were produced during the power reduction period, the total costs incurred as a result of the reduction were $1,576,795.

■ The district court found that "[d]espite hours devoted to cross-examination of plaintiff's witnesses on PX–41, the defendant did not seriously challenge any of the

15. Con Edison's other contentions on liability merit only minimal discussion. Its equal protection claim is frivolous. Asserting that the different treatment between the 450 MW recipients and Con Edison constitutes unconstitutional invidious discrimination, Con Edison invokes traditional equal protection analysis in its effort to defeat the Government's surcharge claim. *But see City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1203 (2d Cir. 1977), *petition for cert. filed,* 46 U.S.L.W. 3723 (U.S. May 23, 1978). Con Edison argues that the AEC had no rational basis for imposing a surcharge on it but not on the 450 MW utilities. One rational basis for the AEC's distinction between Con Edison and the 450 MW utilities is that the relinquishment of the initial 450 MW was not so costly to the AEC that the need to seek reimbursement was of obvious importance. When 200 additional MW were relinquished, the proportionate increase in the burden was substantially higher so that the AEC realized that the efficiency-loss costs were getting *out of hand; it also sought* "to renegotiate the agreements with the recipients of the prior reduction to include a surcharge." 452 F.Supp. at 649. Finally, we note that Con Edison's reliance on *Morey v. Doud,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), the only case in the last 50 years to invalidate an economic regulation on equal protection grounds, is totally misplaced; *Morey* was expressly overruled in *City of New Orleans v. Dukes, supra,* 427 U.S. at 306, 96 S.Ct. 2513. *See Image Carrier Corp. v. Beame, supra,* 567 F.2d at 1202–03.

Con Edison's unclean hands and estoppel arguments are also without merit. Both arguments fail because the district court specifically found that the Government communicated its surcharge demand to Con Edison in advance of the power release. That Con Edison was not specifically informed that the 450 MW utilities were not paying a surcharge does not matter since the district court also found that Con Edison was informed that it would be paying a different surcharge anyway. Thus whether the surcharge imposed on the 450 MW utilities was two mills, four mills, or zero mills is irrelevant for purposes of determining the level of Con Edison's surcharge once it has been determined that Con Edison knew it was expected to pay a different surcharge.

16. *Peninsular & Oriental* makes it clear that in emergency assistance situations, the proper measure of damages is the assisting party's costs. *See* 553 F.2d at 836–37 & n.7. In quasi-contract, it is appropriate to look to measures of damages other than the amount by which the defendant is benefited where that amount is not susceptible of proof. *See Campbell v. Tennessee Valley Authority,* 421 F.2d 293, 296 (5th Cir. 1969).

17. PX 41 is reproduced in part in the appendix.

18. PX 41 was admissible under Rule 1006 of the Federal Rules of Evidence as a summary of voluminous writings. Con Edison argues that Rule 803(6), however, precludes admissibility of PX 41. Purportedly, the business records exception to the hearsay rule prevents the AEC's introduction into evidence of the business records of the independent contractors who were operating the AEC's gaseous diffusion centers. There is no basis for limiting Rule 803(6)'s operation to introduction of one's *own* business records. And nothing in the record suggests that the independent contractors' business records could *not* qualify under Rule 803(6). *See* 56 F.R.D. 293, 307–11 (1973).

factual bases of PX–41." We agree with the district court's findings of fact. However, we consider that one component of this calculus leads to overcompensation of the Government and thus is not warranted by law. *See Peninsular & Oriental, supra,* 553 F.2d at 836–37 & n.7; J. Calamari & J. Perillo, *Contracts* § 15–4, at 475.

PX 41 includes the AEC's own "fixed operating" and "added factor" costs[19] (as distinguished from the costs relating to the operation of the three specific gaseous diffusion centers) in calculating the SWU production cost actually incurred during the power reduction period and the cost had there been no power reduction for the benefit of Con Edison. Because AEC's fixed operating and added factor costs would have been incurred to the same extent whether or not the power release to Con Edison had occurred and since there is no direct relationship between these costs and the power release, they should not have been included in the calculation. There is obviously a direct relationship, however, between the incremental cost of SWU production and the overhead costs at the three plants since the per SWU cost at each center was directly affected by the power release. Accordingly, the incremental cost per SWU should be reduced by recomputing both the actual costs incurred during the relevant period and the costs that would have been incurred absent a power release but without taking into account the AEC's own fixed operating and added factor costs that appear as Part D of Table I in the appendix.[20] The Government's damages therefore are reduced to $1,467,018.00.[21]

**19.** These costs are in the nature of overhead expense.

**20.** The calculation is made by reducing the actual cost of SWU production ($20,938,492) as well as the hypothetical cost of separative work if no power reduction had been made ($22,321,164) by the amount of $828,369, representing the AEC's fixed operating and added factor costs.

An alternative measure, or perhaps even an additional amount to make the AEC fully whole, might be the replacement cost of the 125,772 SWU's which were not produced at all during the power reduction. The replacement cost at the time would have been at the rate of approximately $23.53 per SWU, or a total of more than $2,950,000. The amount would be offset by the benefit which the AEC enjoyed as a result of the power reduction. *See* J. Calamari & J. Perillo, *Contracts* § 15–4, at 574 (2d ed. 1977). Because of the reduction, the AEC spent $1,382,672 less on power than it would have and has therefore had the use of this money. Accordingly, an offset of the income from this amount at the legal interest rate from the date of the power reduction to the date of judgment would be appropriate if that measure were adopted. However, since the Government has never apparently sought to replace the nonproduced SWU's and has not here sought additional compensation for them, the Government's measure of damages is limited to the incremental cost per SWU actually produced.

**21.** We find Con Edison's various other defenses unpersuasive. First, Con Edison raises a "passing-on" defense. Relying on dictum in *Hanover Shoe, Inc. v. United Shoe Machinery,* 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968) (rejecting passing on defense), "that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged . . . ." Con Edison analogizes the AEC's situation to that in the *Hanover Shoe* dictum. However, there is nothing in the record to show that Con Edison had *pre-existing* cost-plus contracts which guaranteed demand. Nor has Con Edison showed that the AEC sales did not suffer as a result of its increased costs. In short, the record does not show the precise effect that the losses resulting from the reduction had upon the demand for the AEC's services (here SWU's), see *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), notwithstanding a statute which requires the AEC at some point to recover its costs. *See* 42 U.S.C. § 2201(v)(B). In addition, Con Edison's position would put the AEC in the difficult situation of never being able to recover contract or tort damages since those uncompensated costs might ultimately be passed on to its customers. Such a result would remove any incentive for private parties to adhere to contracts made with government entities which pass along costs to its customers. Con Edison's reliance on *Plimpton Mfg. Co. v. United States,* 15 Ct.Cl. 14 (1879), another form of the passing on defense, is unpersuasive for the same reasons.

Con Edison's contention that the AEC has not been damaged because it includes a 15% contingency factor in the price charged for its uranium enrichment service must also be rejected. First, Con Edison overlooks the fact that the Government has incurred real economic loss by virtue of its power release to Con

Con Edison has proffered five alternative measures of damages. We find each of them unacceptable. Con Edison first puts forth as its measure of the AEC's costs what it calls *power* efficiency losses. This method, presented by Con Edison's expert witness, Dr. Leonard Geller, was defined as "a surcharge that would be applicable to recover [a] loss of efficiency effect in the use of the electricity," on the basis that power costs increase as a power load decreases by virtue of less efficient use of the energy involved. Thus, the method purports to measure costs relating to incremental power efficiency loss from the power release. Dr. Geller's calculations indicate a power efficiency decrease of $0.1520 per SWU. This amount would then be multiplied by the 822,833 SWU's actually produced during the power reduction period for total damages of $125,070. The weakness in the theory, and the reason we reject it, is that it focuses solely on the AEC's incremental power efficiency loss and not on its other incremental SWU costs incurred by the enrichment plants which directly resulted from the power release program. To make the AEC whole the increased cost of SWU production must be compensated; to pay only the power component of that increment would understate the Government's damages.

Dr. Geller's second theory suggests a power, rather than a monetary, surcharge. That is, Con Edison would pay a surcharge of between 10 and 20% of the raw power cost—the typical surcharge in the industry for emergency power releases. This approach however overlooks the sui generis nature of the release here in question. Presumably, in most power release situations, a 10–20% surcharge will compensate a releasing utility for special costs that it incurs in releasing and transmitting power. But it is precisely because the AEC was Con Edi-

son's only possible power source during this crisis that makes the industry-wide practice an inapposite measure of damages. *See Peninsular & Oriental, supra,* 553 F.2d at 836. The AEC incurred costs which the typical utility, which is not in the business of enriching uranium, would not incur. It is, as we have said analogous to a manufacturer rather than an electric utility although its manufactured product happens to be stored energy for future generating purposes. *See* note 1 *supra.*

Next, Con Edison puts forth a "threshold method" of calculating a surcharge. The underlying theory of this method is to measure the AEC's damages by the excess of the cost of the 200 MW reduction over the estimated cost of the 450 MW reduction. Thus, if the 200 MW reduction would cost an additional five mills PKH and the 450 MW reduction would cost four mills PKH, Con Edison would pay only the difference of one mill PKH. Presumably this method would take account of Con Edison's insistence on equal treatment with the 450 MW utilities, but recognize that the AEC's efficiency loss was greater for the 200 MW reduction than for the 450 MW reduction. Thus because the 450 MW utilities did not pay their four mills surcharge, Con Edison need not pay the first four mills of its five mill surcharge. This is a clever formulation by Con Edison, but it distorts the obvious implications of the district judge's finding that Con Edison would be expected to pay a *different* surcharge from that paid by the other utilities. *Ante* at p. 1125.[22] Thus, even if there were an enforceable contract, the contract terms would not justify the "threshold" measure of damages since the fact that the 450 MW utilities paid no surcharge would be legally irrelevant. Moreover, the "threshold" method overlooks the theory of liability on which we base our

Edison. The 15% contingency factor argument is merely a warmed-over version of the passing-on defense which we find inapposite. And second, the district court found that the 15% contingency factor was not intended to "cover the *extraordinary* type of losses which occurred here." 452 F.Supp. at 651 (emphasis added). While it might cover minor production

interruptions, the court concluded that it was not supposed to cover a substantial and sustained interruption of the type at issue here.

22. The import of the district judge's finding is to eviscerate Con Edison's claim that it was only obligated to pay a surcharge equal to that paid by the 450 MW utilities.

opinion—the emergency assistance doctrine which obligates Con Edison to pay costs. Thus, the threshold method is really an attempt to premise damages on a contract theory; as such its application would distort the district judge's findings of fact.

Con Edison's fourth damages formulation is termed a "price planning data approach," which attempts to give effect to the "time" impact upon the losses claimed by the Government. Con Edison purports to adopt the AEC's own ten-year pricing methodology whereby the agency projected costs, SWU production and sales for the ten-year planning period—fiscal years 1971–1980. The AEC then discounts to an end-of-fiscal-year-1970 "present worth" all of the projected cumulative costs, revenues, SWU sales and so forth. Con Edison employs a similar "discount" to measure the net economic impact of the 200 MW reduction expressed in terms of the 1970 net worth. There are, however, several problems with this approach which lead us to reject it.

First it borrows a planning and pricing economic model for the purpose of measuring damages incurred. While that might be a valid approach in some instances, it seems highly speculative to us especially since the *actual* cost data from the precise period involved are available. And, second, the figures on which Dr. Geller based his projections have not withstood the test of time, as the district court found. 452 F.Supp. at 652. Con Edison would have us ignore what has transpired since 1970 in terms of astronomical cost increases in SWU produc-tion [23] and measure damages based on hypothetical figures from the vantage of year end 1970. This approach would grossly distort the true impact of the power release on the AEC's gaseous diffusion centers.

Finally, Con Edison suggests a fifth alternative measure of damages—an "average" surcharge approach. Thus, Con Edison would pay a surcharge in which total efficiency-loss costs from both the 450 MW and the 200 MW reduction would be blended; since the efficiency losses from the first reduction were less than those of the second, the effect of this approach is to lower Con Edison's damages and to put Con Edison in the position it would have been if the AEC had agreed that Con Edison would pay the same costs as the 450 MW utilities and if those utilities had indeed obligated themselves to pay a surcharge or found themselves in an emergency situation similar to that facing Con Edison. Again, we are unable to accept this approach. The acceptance of emergency assistance obligated Con Edison to reimburse the Government for incurred costs. Those are the costs which flow from the emergency assistance; any other costs are extraneous to the incurrence of those emergency assistance costs.

Accordingly, we find none of Con Edison's approaches to the damages issue acceptable. We therefore affirm the district court's finding of liability and modify its damages award as set forth above.

Affirmed as modified.

Appendix to follow.

---

**23.** Per SWU costs have increased from approximately $23.53 in 1970 to over $60 today.

## APPENDIX

### PX 41

Increased Cost Due to Relinquishment By The AEC of Its Contract Rights to 200 MW Of Power To Benefit Consolidated Edison Company of New York, Inc. 7/26/70—10/1/70

| | Cost | Units of Separative Work | Unit Cost of Separative Work |
|---|---|---|---|
| Actual Unit Cost of Separative Work During Period of Reduced Power for Consolidated Edison (Pgs. 2 & 4) | $20,938,492 | 822,833 | $   25.4468 |
| Unit Cost of Separative Work Assuming No Reduction Of Power to Benefit Consolidated Edison (Pgs. 3 & 6) | 22,321,164 | 948,605 | 23.5305 |
| Increased Unit Cost at Reduced Power | | | $    1.9163 |
| Separative Work Units Produced at Reduced Power | | | 822,883 |
| Increased Total Cost ($1.9163 × 822,833) | | | $ 1,576,795 |

### TABLE I—COSTS

1. Actual Costs Incurred During Period of Power Reduction To Benefit Consolidated Edison

| | 1970 | | | | |
|---|---|---|---|---|---|
| | July | August | September | October | Total |
| **A. ORGDP** | | | | | |
| Power Cost | $  201,837 | 1,246,510 | 1,389,836 | 10,900 | 2,849,083 |
| Fixed Operating Cost | 170,004 | 1,074,238 | 1,277,969 | 8,550 | 2,530,761 |
| Added Factor Cost | 95,055 | 611,445 | 598,603 | 3,685 | 1,308,788 |
| Total ORGDP | 466,896 | 2,932,193 | 3,266,408 | 23,135 | 6,688,632 |
| **B. Paducah** | | | | | |
| Power Cost | 326,213 | 1,867,448 | 2,848,899 | 41,759* | 5,076,870* |
| Fixed Operating Cost | 154,998 | 940,679 | 1,153,627 | 12,720 | 2,262,024 |
| Added Factor Cost | 10,256 | 55,050 | 59,867 | 751 | 125,924 |
| Total Paducah | 491,467 | 2,863,177 | 4,062,393 | 54,939 | 7,471,976 |
| **C. Portsmouth** | | | | | |
| Power Cost | 199,239 | 1,057,088 | 1,027,559 | 16,025 | 2,295,547* |
| Fixed Operating Cost | 235,861 | 1,520,765 | 1,558,976 | 24,513 | 3,340,115 |
| Added Factor Cost | 28,493 | 145,423 | 133,279 | 2,294 | 309,489 |
| Total Portsmouth | 463,593 | 2,723,276 | 2,719,814 | 42,832 | 5,949,515 |

APPENDIX—Continued

TABLE I—COSTS—Continued

1. Actual Costs Incurred During Period of Power Reduction To Benefit Consolidated Edison

|  | 1970 | | | | |
|---|---|---|---|---|---|
| D. AEC | July | August | September | October | Total |
| Fixed Operating Cost | 3,200 | 34,524 | 22,713 | 255 | 60,692 |
| Added Factor Cost | 57,493 | 336,062 | 369,989 | 4,133 | 767,677 |
| Total AEC | 60,693 | 370,586 | 392,702 | 4,388 | 828,369 |
| Total Costs | $1,482,649 | 8,889,232 | 10,441,317 | 125,294 | 20,938,492 |

\* Sic.

NOTE: The above are actual cost incurred by the AEC in the Uranium Enrichment Activity and are exclusive of cost related to other non-uranium enrichment AEC activities. . . . .

2. Cost Assuming No Power Reduction to Benefit Consolidated Edison

|  | 1970 | | | | |
|---|---|---|---|---|---|
| A. ORGDP | July | August | September | October | Total |
| Power Cost | $ 229,492 | $1,423,212 | $ 1,562,637 | $ 11,495 | $ 3,226,836 |
| Fixed Operating Cost | 170,004 | 1,074,238 | 1,277,969 | 8,550 | 2,530,761 |
| Added Factor Cost | 95,055 | 611,445 | 598,603 | 3,685 | 1,308,788 |
| Total ORGDP | 494,551 | 3,108,895 | 3,439,209 | 23,730 | 7,066,385 |
| B. Paducah | | | | | |
| Power Cost | 377,841 | 2,190,375 | 3,165,502 | 43,633 | 5,777,351 |
| Fixed Operating Cost | 154,998 | 940,679 | 1,153,627 | 12,720 | 2,262,024 |
| Added Factor Cost | 10,256 | 55,050 | 59,867 | 751 | 125,924 |
| Total Paducah | 543,095 | 3,186,104 | 4,378,996 | 57,104 | 8,165,299 |
| C. Portsmouth | | | | | |
| Power Cost | 226,521 | 1,212,281 | 1,179,686 | 17,019 | 2,635,507 |
| Fixed Operating Cost | 235,861 | 1,520,765 | 1,558,976 | 24,513 | 3,340,115 |
| Added Factor Cost | 28,493 | 145,423 | 133,279 | 2,294 | 309,489 |
| Total Portsmouth | 490,875 | 2,878,469 | 2,871,941 | 43,826 | 6,285,111 |
| D. AEC | | | | | |
| Fixed Operating Cost | 3,200 | 34,524 | 22,713 | 255 | 60,692 |
| Added Factor Cost | 57,493 | 336,062 | 369,989 | 4,133 | 767,677 |
| Total AEC | 60,693 | 370,586 | 392,702 | 4,388 | 828,369 |
|  | $1,589,214 | $9,544,054 | $11,082,848 | $129,048 | 22,345,164 |
| Less Added Maintenance\* | | | — | | 24,000 |
| Total Cost (Page 1) | | | | | $22,321,164 |

\* Extraordinary maintenance cost resulting from power changes of this magnitude have been determined to be $80 per MW change. Total MW change, both reduction and restoration, was 300 (300 × $80 = $24,000).